626 A.2d 1010

Stuart A. MEYERS

v.

MONTGOMERY COUNTY POLICE DEPARTMENT, et al.

No. 1190, Sept. Term, 1992.

Court of Special Appeals of Maryland.

July 1, 1993.

Gary I. Crawford (Clarke, Crawford & Bonifant on the brief), Gaithersburg, for appellant.

Ramona Bell–Pearson, Asst. County Atty. (Joyce R. Stern, County Atty. and Bruce P. Sherman, Sr. Asst. County Atty. on the brief), Rockville, for appellees.

Argued before WENNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

Following a call to the police from a residence in Montgomery County concerning a domestic dispute, the police officers dispatched to the scene arrested both the husband and wife involved in the dispute. The wife subsequently filed a complaint alleging brutality against the arresting officers, Police Officer III Stuart Meyers, appellant, and Police Officer III Michael Diggs. The complaint was investigated by the Office of Internal Affairs of the Montgomery County Police Department. As a result of the investigation, the police department lodged two allegations of violations of the use of force directive, Montgomery County, Dept. Reg. 82–55, Function Code 300, II, Rule 6, against Officer Meyers and lodged one allegation of violation of the use of force directive against Officer Diggs.

Pursuant to the Law Enforcement Officers' Bill of Rights (LEOBR), Md.Ann.Code art. 27, §§ 727–734D (1992), the officers requested that testimony and evidence on the allegations be taken by an Alternate Hearing Board. The Alternate Hearing Board (AHB or the Board) was comprised of Earle W. Hockenberry, Jr., Esq., as the chairperson, Captain James A. Taylor, and Police Officer Victor A. Kennedy. The AHB convened on 1 October 1991 and heard testimony and received evidence for two days. At the conclusion of the hearing, the majority of the Board, through an oral ruling by its chairperson, found that Montgomery County had proven, by a preponderance of the evidence, that Officer Meyers was guilty of only

one of the allegations. The Board further ruled that it unanimously found that the County had not met its burden of proof as to Officer Diggs.

Immediately following the ruling by the AHB, counsel for Officer Meyers made a motion for reconsideration, attacking the evidentiary standard—preponderance of the evidence—applied by the Board. Officer Meyers's counsel argued that based on § 730(e) of the LEOBR and the nature of the proceedings, the AHB should have applied the clear and convincing standard of proof. After considering counsel's arguments, the Board declined to apply the clear and convincing evidentiary standard.

The AHB then took evidence and heard testimony on Officer Meyers's service record. Following a brief recess, the Board reached a unanimous decision that Officer Meyers should be suspended from work without pay for two days.

On 15 October 1991, the AHB chairperson, in a memorandum to Colonel Clarence Edwards, the Montgomery County Chief of Police, set forth the findings of the Board and again recommended that Officer Meyers be suspended from duty for two days without pay. The Chief of Police, instead, placed a Letter of Reprimand, dated 28 October 1991, in Officer Meyers's personnel file.

On 26 November 1991, Officer Meyers filed an Order for Appeal with the Circuit Court for Montgomery County pursuant to Art. 27, § 732 and Md.Rule B2. On 12 March 1991, Montgomery County filed a motion to dismiss Officer Meyers's appeal. The circuit court (Weinstein, J.), by order dated 1 April 1991, denied the County's motion. At the direction of the circuit court and by agreement of the parties, each side presented their arguments in memoranda to the court in lieu of oral argument. On 9 June 1992, the circuit court issued an opinion and order affirming the decision of the Alternate Hearing Board and the chief of police. Officer Meyers noted a timely appeal to this Court on 6 July 1992.

## Facts

On 7 October 1990, Mrs. Shahnaz Givpour[1] called the police operator claiming that she had been beaten by her husband, Mr. Mohammed Givpour. Mrs. Givpour requested police assistance. Officer Diggs received the call from the police dispatcher to respond to Mrs. Givpour's request. Officer Meyers volunteered to back-up Officer Diggs; however, Officer Meyers was the first police officer to arrive at the Givpours' residence. Upon arriving, he approached the Givpours' town house and sought to assist Mrs. Givpour and the Givpours' three daughters in leaving the residence. Mr. Givpour, however, did not want his two younger daughters to leave with the officer. A fight between Officer Meyers and Mr. Givpour ensued; Officer Diggs joined this fight after he arrived at the scene. The fight spilled out of the Givpours' town house and into the parking lot where the officers eventually subdued, handcuffed, and arrested Mr. Givpour. Mrs. Givpour was also arrested by Officer Diggs for interfering in the struggle between the officers and her husband.

To paint a fuller picture of the events that took place at the Givpours' residence on 7 October 1990, we recount the testimony given by the witnesses that appeared before the AHB.

At the hearing, Mrs. Givpour testified to the following events: On 7 October 1990, she and her husband had an argument and she called 911 to request assistance. Shortly after she placed the call, Officer Meyers knocked on the door of the family home. Officer Meyers entered the residence and Mr. Givpour, who had been lying on the floor, stood up. Mrs. Givpour told Officer Meyers that she and her husband had just had a fight and that she wanted the officer to take her husband out of the house.

Mrs. Givpour sought to have Officer Meyers remove her husband from the house because she had received police assistance in a similar situation on a prior occasion. Approxi-

---

1. Mrs. Givpour also uses the name Mrs. Ghassemi. We refer to her throughout this opinion as Mrs. Givpour.

mately one and a half years prior to the incident giving rise to this appeal, Mrs. Givpour had called the police seeking assistance during a domestic dispute. The officers responding to the call, whom Mrs. Givpour described as very nice, calmed Mr. Givpour by sending him outside for a walk and to smoke a cigarette.

After Mrs. Givpour asked Officer Meyers to remove her husband from the home, Meyers asked Mrs. Givpour to follow him so that she could make out a complaint. Mrs. Givpour did not understand what that entailed, but Officer Meyers stated that he would explain it to her outside the house. Mrs. Givpour and her eldest daughter, then about seventeen years of age, began to leave with the officer. Officer Meyers then asked Mrs. Givpour about the two younger daughters, whose ages at that time were approximately nine and three and a half years. Meyers asked the girls if they wanted to leave with their mother. The girls indicated that they did not wish to leave the house, but Officer Meyers approached the younger children and told them to come with him. Mr. Givpour then stepped toward the officer and sought to prevent the children from leaving. Officer Meyers pushed Mr. Givpour out of the way, but Mr. Givpour again sought to prevent his children from leaving and, again, Meyers pushed Mr. Givpour out of the way.

The altercation between Officer Meyers and Mr. Givpour eventually turned into a fight with punches being thrown, at which point, Mrs. Givpour and her eldest daughter ran outside. Once outside, they sat in Mrs. Givpour's car, but eventually Mrs. Givpour approached the house and watched the fight through the screen door of the house. After approximately two minutes, Officer Diggs arrived and went inside the town house and joined Meyers in hitting Mr. Givpour. Mrs. Givpour then approached Mr. Calvin Richards, a neighbor who was outside washing his car, and asked him to enter the house to take the younger children outside. Mr. Richards entered the home, but one of the officers told him to leave. Mrs. Givpour then entered the home and when she saw her husband lying on the floor, she told the officers, "You killed my

husband." Officer Meyers then hit Mrs. Givpour with an unidentified object.

Continuing to testify, Mrs. Givpour related that Officer Meyers then pushed her husband through the screen door. Her husband stumbled down the front steps of the town house and fell in the parking lot, which is only a short distance from the front steps, between two parked cars. Officers Meyers and Diggs and Mrs. Givpour followed Mr. Givpour outside. While Mr. Givpour was on the ground, the officers handcuffed him. Mrs. Givpour stated that even after the officers had handcuffed her husband, they continued to hit and kick him. In addition, Mrs. Givpour stated that she observed one of the officers walk on her husband after he was handcuffed.

Mrs. Givpour testified that during the struggle between the officers and her husband she was screaming and crying. Officer Diggs had pushed her to the ground twice and, after the second time, Diggs handcuffed Mrs. Givpour and put her in a patrol car. Mrs. Givpour stated that she never touched either of the officers during the incident and after being placed in the police car was unable to observe any further actions by the police officers.

On cross-examination, Mrs. Givpour denied that she told the District Court Commissioner, Ms. Sandra Farber, that her husband had beaten her on 7 October 1990. Mrs. Givpour further denied asking the commissioner to explain a domestic violence petition and how she could stop her husband from beating her. Mrs. Givpour also denied admitting to the commissioner that she had jumped on Officer Diggs's back. Mrs. Givpour did acknowledge, however, that she had pressed charges against her husband several years earlier and that she had requested police assistance during a domestic dispute in October 1989. Mrs. Givpour did not remember that it was Officer Meyers, along with a female police officer, who had responded to her request for assistance in 1989.

Mrs. Givpour further testified on cross-examination that she never saw her husband strike either one of the officers. She also stated that her husband had not hit her or pushed her

against the wall on the day of the incident, but agreed that the couple did have a fight prior to the police arriving. She insisted, however, that the fight had involved only yelling and screaming. Mrs. Givpour further denied that she told Officer Meyers, when he arrived at the Givpour's town house, that she did not call the police and that she told Meyers that she was having difficulty breathing because her husband had hit her in the chest. Mrs. Givpour further denied having testified in the circuit court on 4 February 1991 that she had grabbed Officer Meyers.

Mr. Givpour, on direct examination, stated that when Officer Meyers arrived there was a brief discussion between Mrs. Givpour and the officer, then the officer, Mrs. Givpour, and the oldest daughter started to leave the town house. Before leaving, however, Officer Meyers asked the younger daughters if they wanted to come outside also. It is unclear from the transcript what Mr. Givpour stated was the reply that the children gave to the officer, but Officer Meyers took the hand of one of the girls and started towards the front door. Mr. Givpour held up his hand, talked to the officer, and, in essence, sought to prevent the girls from leaving the residence.

Officer Meyers responded by pushing Mr. Givpour out of the way and stated that he did not want to speak to Mr. Givpour. This happened again, but the second time, Officer Meyers pushed Mr. Givpour to the floor and hit him with his hand-held police radio. Mr. Givpour stated that he was punched, struck with the police radio, and kicked by Officer Meyers. Officer Diggs then entered the house and joined Meyers in hitting Mr. Givpour. Mr. Givpour testified that he was pushed out the front door and fell down the stairs of the town house and into the parking lot between two parked cars. He did not know which officer pushed him.

Mr. Givpour stated that he was lying on the ground on his stomach when the officers handcuffed him and that the officers continued to hit him even after he was handcuffed. Most of the blows were directed to his head and face. Mr. Givpour testified that he did not hit or attempt to hit either officer

while he was on the ground between the two parked cars. Mr. Givpour described his injuries as the loss of four teeth, a broken jaw, a broken rib, and various cuts and bruises. After the arrest, Mr. Givpour was examined by paramedics, transported to the police station, and then taken to the hospital. Mr. Givpour also denied hitting his wife during the domestic dispute that took place on 7 October 1990.

There were several other witnesses to various portions of the incident, all of whom had a slightly different view of the struggle as it unfolded.

Mrs. Jennifer Richards testified that she was in the kitchen of her home when she heard the altercation outside. When she stepped outside to investigate, she saw two officers standing over a person, whom her husband identified as Mr. Givpour, lying on the ground between two parked vehicles. Mrs. Richards stated that she stood directly in front of her residence and was between sixteen to twenty-five feet from the officers. She saw the officers attempting to restrain Mr. Givpour in order to handcuff him. Although Mrs. Richards could not directly observe the officers handcuff Mr. Givpour, because the parked cars obstructed her view, she believed that eventually the officers did succeed in handcuffing him. Mrs. Richards stated that her belief that Mr. Givpour was handcuffed came from her observation of his actions—his movement appeared to be restrained, he could not move freely. In addition, at first the officers were bent over Mr. Givpour so that Mrs. Richards could barely see their bodies, but then they stood up straight. She did not observe Mr. Givpour hitting or kicking the officers.

Mrs. Richards became alarmed at the force used by the officers because of the "groaning and moaning coming from Mr. Givpour." Mrs. Richards's concern caused her to walk towards the officers and Mr. Givpour so that she could have a clear field of vision unobstructed by the parked cars. Upon moving closer, she was now only several feet away from the scene, she could see that Mr. Givpour was handcuffed and that Officer Meyers was "swizzling his foot" on Mr. Givpour's back.

She then asked the officers to call an ambulance, but the officers told her to move away or she would be arrested. Mrs. Richards also testified that from the time that she moved from her original point of observation to when she gained an unobstructed view of the arrest scene, the officers took no action that would lead her to believe that they were handcuffing Mr. Givpour.

Mrs. Richards observed Mrs. Givpour screaming at the officers, but at no time did she see Mrs. Givpour interfere with their arrest of her husband. Mrs. Richards further testified that she observed Officer Meyers hit Mr. Givpour with his two-way radio and that Officer Diggs used his flashlight to strike some blows;[2] however, when Mrs. Richards had an unobstructed view, the only thing she saw was Officer Meyers "swizzling" his foot in Mr. Givpour's back. After Mr. Givpour was put in the police car, Mrs. Richards began to clean up the scene and found Mr. Givpour's knocked-out teeth in the parking lot and on the steps of the Givpours' town house.

On cross-examination, Mrs. Richards admitted that she did not actually observe the officers striking Mr. Givpour, but she did observe the officers make striking actions while Mr. Givpour was on the ground moaning; therefore, she was led to the conclusion that they would not be striking the ground, but were instead striking Mr. Givpour.

Mr. Calvin Richards, Mrs. Richards's husband, testified that he was outside washing his truck when Officer Meyers arrived and entered the Givpours' town house. After a short time Mr. Richards heard noises coming from inside the town house and saw Mrs. Givpour and her daughter come outside and get in the car. He heard Mr. Givpour yelling "you're killing me" so Mr. Richards walked to the Givpours' residence and opened the door. Officer Meyers told him to leave, which he did. Mr. Richards backed away from the house and stood on the pavement. Shortly thereafter, Officer Diggs arrived and en-

---

**2.** Later in her testimony, Mrs. Richards was unable to recall which officer held the radio and which held the flashlight.

tered the Givpour home. Mr. Richards stated that he heard more screaming coming from the town house. Then the screen door flew open and Mr. Givpour came out. Mr. Richards observed Officer Meyers push Mr. Givpour down with his foot and Mr. Givpour stumbled down the steps, falling in front of a parked truck. Officer Diggs grabbed Mr. Givpour and in the struggle between the officers and Mr. Givpour the three ended up on the ground between two parked cars. The officers then handcuffed Mr. Givpour and started to beat him. Although Mr. Richards could not actually see the officers make contact, he could see a flashlight and two-way radio moving up and down in a striking motion. Mr. Richards, however, could only see the lower half of Mr. Givpour's body. He was able to see that Mr. Givpour was handcuffed after moving to gain a view of the incident unobstructed by the parked vehicles. At that time, Mr. Richards observed Officer Meyers "swizzling" his foot on Mr. Givpour's back.

In reference to Mrs. Givpour, Mr. Richards testified that while she was outside, she was screaming "don't kill my husband." She attempted to move closer to the three men to see what the officers were doing to her husband, but Officer Diggs told her to move away. Officer Diggs then pushed Mrs. Givpour to the sidewalk, handcuffed her, and placed her in his patrol car. Mr. Richards did not observe Mrs. Givpour touch either of the officers or physically interfere with their arrest of her husband.

Another neighbor, Mr. Gary Borda, also testified at the hearing. In the early afternoon of 7 October 1990, Mr. Borda and his wife were in their dining room when they "heard a couple of bangs" on the common wall they share with the Givpours. Mr. Borda looked outside and saw a police car so he returned to the dining room. When he later heard yelling in front of his town house, Mr. Borda went outside. While standing on the front steps of his town house, approximately twenty feet from the incident, Mr. Borda saw the two officers standing over Mr. Givpour who was lying on the ground

between a parked car and a parked truck. Mr. Givpour's legs were pointing toward the town houses.

At first, Mr. Borda observed that Mr. Givpour was struggling. He was thrashing around on the ground and pushing against the side of the car. Mr. Borda thought that the officers were trying to handcuff Mr. Givpour because they were telling him to hold still. During the struggle, Mr. Borda saw Officer Meyers hit Mr. Givpour with his walkie-talkie a couple of times.

Mr. Borda stated that he believed the officers succeeded in handcuffing Mr. Givpour because they stood up and relaxed, but Mr. Givpour remained lying on the ground. He then observed Officer Meyers make a kicking action where Mr. Borda believed Mr. Givpour's abdomen would be. Mr. Borda also observed Officer Meyers "come down with the walkie-talkie" three or four more times around what he believed would be Mr. Givpour's head or shoulders. Mr. Borda did admit, however, that he could not see the blows make contact with Mr. Givpour because his view was obstructed by the parked vehicles. Mr. Borda did have a clear view, however, of Officer Meyers stomping on Mr. Givpour's leg after he was handcuffed. Mr. Borda described the force used by Officer Meyers, after Mr. Givpour was handcuffed, as moderate to heavy. After he believed Mr. Givpour was handcuffed, Mr. Borda did not see Mr. Givpour struggle with the officers. At one point, Mr. Borda called to the officers, asking them to stop and put Mr. Givpour in the patrol car. Mr. Borda was told by Officer Meyers to mind his own business. Mr. Borda stated that he never saw Mr. Givpour hit or kick either one of the officers.

Mr. Borda also testified as to Mrs. Givpour's actions during her husband's arrest. Mr. Borda observed her pacing up and down the sidewalk asking the officers to stop hurting her husband. He did not see Mrs. Givpour interfere with the officers. Nor did he see her attempt to touch either of the officers. He did state, however, that she could have brushed against Officer Meyers as she paced up and down the side-

walk. Eventually, Officer Meyers told her to move away or she would be arrested. Mrs. Givpour continued in her action of pacing along the sidewalk; therefore, Officer Diggs walked around the car and pushed her so she was leaning over a truck, handcuffed her, and put her in a patrol car. On cross-examination, Mr. Borda stated that he did not see Officer Diggs push Mrs. Givpour to the ground.

Mr. Borda testified on cross-examination that most of his view was blocked by the parked cars and that all he saw of Mr. Givpour's body was from the mid-thigh on down. He never left the front steps of his house and did not actually see the officers handcuff Mr. Givpour.

Ms. Sandra Farber, the District Court Commissioner for the Sixth District Court of Maryland, was called to testify by Officer Meyers. As the District Court Commissioner, Ms. Farber met with Mrs. Givpour shortly after the incident in question. Ms. Farber testified that when Mrs. Givpour arrived she was "timid" and "upset." Ms. Farber stated that during the arraignment hearing, Mrs. Givpour had admitted to her that she, Mrs. Givpour, had "jumped on the officers' backs because she was afraid that they were hurting her husband." Mrs. Givpour also wanted to open her blouse to show the commissioner where she had been hit on the chest by her husband. The commissioner told her that it was not necessary for her to see the bruises. Mrs. Givpour had explicitly told the commissioner that her husband had hit her. The commissioner also testified that Mrs. Givpour did not say anything about the officers' actions, she spoke only of her own conduct during the incident.

The commissioner decided to break the hearing down into two parts: the question of why Mrs. Givpour had been arrested and then dealing with Mrs. Givpour as a victim of domestic violence. After explaining to Mrs. Givpour why she had been arrested, the commissioner described a domestic violence petition and told Mrs. Givpour about the family crisis center in the county. At the end of the explanation, Mrs. Givpour thanked the commissioner and stated that she was going to get the

petition. As Mrs. Givpour was leaving, however, two male relatives approached her and spoke to her in her native language, Farsi, and it was the commissioner's impression that Mrs. Givpour once again became "meek" and "timid." Before leaving, the men turned to the commissioner and stated that Mrs. Givpour would not be seeking the domestic violence petition.

Appellant, Officer Meyers, gave the following testimony before the AHB: On 7 October 1990, Officer Diggs received the call from the police dispatcher to respond to the Givpours' residence because of a domestic dispute and Officer Meyers volunteered to be back-up for Diggs. Officer Meyers arrived first, parked his car, and approached the residence. At the front door, Officer Meyers recognized Mrs. Givpour because he had been the "nice" officer, along with a female officer, who had handled a previous domestic dispute between the Givpours. Mrs. Givpour told Officer Meyers that she had not called the police, but Officer Meyers checked with the dispatcher who stated that it was, in fact, Mrs. Givpour who had called the police. Mrs. Givpour then told Officer Meyers that her husband had punched her several times in the chest and that she was having problems breathing. She did not want medical assistance.

Mrs. Givpour told Officer Meyers that she wanted to have her husband arrested. Officer Meyers explained that this could be done through an arrest warrant and if she wanted to obtain one she should step outside so that he could explain the process to her. The Givpours' teenage daughter then came down the stairs and stated that she did not want to remain in the house with Mr. Givpour. Officer Meyers said that they could all go outside.

As the three began to walk outside, one of the younger children said that she wanted to go with her mother. Officer Meyers asked Mrs. Givpour if she wanted the younger children to leave with her. Mr. Givpour then approached the officer and told him to leave the house. Mr. Givpour then pushed Officer Meyers and punched him over his left eye.

Officer Meyers informed Mr. Givpour that he was under arrest and a fight ensued. Punches were exchanged and there was some pushing and shoving. Eventually, Officer Meyers was able to fall on top of Mr. Givpour and appeared to gain control. Mr. Givpour told the officer that he did not want to fight anymore. Officer Meyers got up off of Mr. Givpour, retrieved his portable radio, and requested immediate assistance.

Officer Meyers was near the doorway with his radio when Officer Diggs entered the residence. Officer Meyers turned to Officer Diggs and informed him that Mr. Givpour was under arrest. As Officer Meyers turned back to Mr. Givpour, Mr. Givpour came charging at the two officers with his shoulders down in a tackling motion and throwing punches. Officer Meyers hit Mr. Givpour with his portable radio. Mr. Givpour took a step back and charged the officers again. Mr. Givpour then kicked Officer Meyers and Meyers kicked Mr. Givpour. Officer Meyers stated that the blows he inflicted had no apparent effect on Mr. Givpour.

The officers grabbed Mr. Givpour, the three men fell to the floor, and the officers tried to handcuff Mr. Givpour. Shortly thereafter, Officer Meyers found himself struggling to handcuff Mr. Givpour alone. He heard Officer Diggs put out a police distress call on the portable radio. Mr. Givpour kicked Officer Meyers in the ankle and ran out the front door of the town house. Officer Meyers ran after Mr. Givpour and saw that in his haste, Mr. Givpour had fallen down the front steps. Officer Meyers caught Mr. Givpour in the parking lot and the fight continued. Kicks and punches were exchanged. Officer Meyers stated that he used "foot-blocks" to protect himself from Mr. Givpour's kicks. The officers were able to get Mr. Givpour down with one arm behind his back; however, his other arm was underneath him. Mr. Givpour was still kicking and thrashing around. In addition, while the officers struggled with Mr. Givpour, Mrs. Givpour jumped on Officer Meyers's back. Officer Meyers saw Officer Diggs pull Mrs. Givpour off, but did not see Diggs handcuff or arrest her. Finally, after Officer Diggs returned to the struggle, the

officers were able to handcuff Mr. Givpour. Officer Meyers stated that Mr. Givpour was not stomped on or hit by either of the officers after he was handcuffed.

After Mr. Givpour was handcuffed, the officers noticed that he was bleeding and called for an ambulance. Mr. Givpour was not moved after he was handcuffed because the officers were unsure of the extent of his injuries. The ambulance arrived and the paramedics examined Mr. Givpour and determined that he did not need to be transported to the hospital. Officer Reynolds then transported Mr. Givpour to the Germantown Police Station.

During processing at the Police Station, Mr. Givpour complained that he was injured. An ambulance was called to the Germantown Station and the ambulance personnel stated that Mr. Givpour should be taken to the hospital. Mr. Givpour and Officers Meyers and Diggs were all treated at the Shady Grove Adventist Hospital. Officer Meyers suffered a "crack under [his] thumb[,]" torn cartilage, and tendon damage in his left shoulder.

On cross-examination, Officer Meyers stated that they were able to catch their breath at one point in the struggle when they had one of Mr. Givpour's hands pinned behind his back, with Meyers's knee on Mr. Givpour's arm and back, before continuing in their efforts to gain control of his other arm, and finally handcuff him. Because Mr. Givpour continued to kick after he was handcuffed, Officer Meyers kept his knee in Mr. Givpour's back for a brief moment to restrain Mr. Givpour, but then he moved away.

Officer Diggs also testified before the AHB. He stated that he received a call for a domestic dispute—that the husband had been beating the wife. Officer Diggs arrived after Officer Meyers. As Officer Diggs opened his car door, a man washing his car told Officer Diggs, "Man, you better get in there quick. He needs some help." Officer Diggs grabbed his flashlight and went straight to the Givpours' town house. He could hear screaming and yelling coming from the town house. Officer Diggs entered the residence and Officer Meyers in-

formed him that Mr. Givpour was under arrest. Officer Diggs noticed that Officer Meyers's "clothes had been ... pulled apart a little bit."

Approximately five seconds after Officer Diggs entered the town house, Mr. Givpour put his head down, began yelling, and charged the officers with his arms swinging. As Mr. Givpour charged the officers, Officer Diggs hit him with the flashlight somewhere in the upper body. Officer Diggs dropped the flashlight and then "the fight was on."

Blows were exchanged until all three locked up and went to the floor in the foyer. While struggling, Officer Diggs felt someone jump on his back: it was Mrs. Givpour. He stood up and removed her from his back, pushed her towards the kitchen, and told her to stay out of the fight. Nevertheless, Mrs. Givpour jumped on Officer Diggs's back a second time. Officer Diggs, again, stood up, removed her from his back, and pushed her "quite hard" into the kitchen. As Officer Diggs turned back to the struggle on the floor, he saw Mr. Givpour "running on all fours out the [front] door." Officer Meyers was still on the floor. Officer Meyers then stood up and headed out the door followed by Officer Diggs.

Officer Meyers caught Mr. Givpour in the parking lot and they both fell to the ground. Officer Diggs joined the struggle. The officers were telling Mr. Givpour to put his hands behind his back, but he refused and continued to fight. After a few minutes of fighting in the parking lot, Officer Diggs noticed that Mrs. Givpour had jumped on Officer Meyers's back and was pulling on his arms. Officer Diggs removed Mrs. Givpour from Officer Meyers's back; however, he testified that he was unsure of exactly when he handcuffed her and placed her in the patrol car. The officers were able to get one of Mr. Givpour's arms behind his back, but he continued to fight with his free arm. Eventually the officers were able to handcuff Mr. Givpour and an ambulance was called.

On cross-examination, Officer Diggs testified that he did not see Officer Meyers hit or kick Mr. Givpour after he was handcuffed. After Mr. Givpour was handcuffed, Officer Diggs

placed his foot .on Mr. Givpour's feet because he was still kicking the officers. Officer Diggs stated that he did not move away from Mr. Givpour because Mr. Givpour could still get up and run away. Officer Diggs further testified that he had dropped his flashlight in the first few seconds of the struggle inside the Givpours' town house and did not retrieve it until well after Mr. Givpour was handcuffed.

We will include additional facts as necessary in our discussion of the issues presented.

### Issues

Appellant presents the following issues for our review:

I. Whether the circuit court, chief of police, and Alternate Hearing Board erred when they applied the "preponderance of the evidence" standard rather than the "clear and convincing evidence" standard in their disposition of an administrative allegation, which would otherwise be a criminal offense; and,

II. Whether the decisions of the circuit court, chief of police, and Alternate Hearing Board were supported by substantial evidence.

### Discussion

### I.

■ Officer Meyers first argues that the circuit court, the chief of police, and the Alternate Hearing Board erred when they applied the "preponderance of the evidence" standard of proof rather than the "clear and convincing evidence" standard of proof. Meyers claims this was error because the administrative allegation against him—the use of excessive force—in another forum would constitute a criminal offense. Meyers contends that the Board erroneously relied on the County Administrative Procedures Act, Montgomery County Code, ch. 2A, § 10(b) (1984), and the Montgomery County Police Departmental Directive 82–19, Function Code 301.C, § II(F)(1)(e), which establish the preponderance of the evi-

dence test as the appropriate standard of proof in administrative hearings. No such standard is set forth in the LEOBR.

Officer Meyers refers this Court to several Court of Appeals decisions to support his argument that since the administrative allegations against him included criminal behavior, the clear and convincing standard should be used because of the seriousness of the allegations. Meyers also raises a due process argument under the United States Constitution and Article 24 of the Maryland Declaration of Rights. Meyers claims that the clear and convincing test is the constitutionally required standard of proof in the present case. We disagree with Officer Meyers's arguments and explain.

The Law Enforcement Officers' Bill of Rights, Md.Ann. Code art. 27, §§ 727–734D (1992), was enacted by the General Assembly in 1974. The LEOBR's purpose is to guarantee certain procedural safeguards to law enforcement officers during any investigation or interrogation that could lead to disciplinary action, demotion, or dismissal. *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 452–53, 418 A.2d 1191 (1980); *Abbott v. Administrative Hearing Bd., Prince George's County,* 33 Md.App. 681, 682, 366 A.2d 756 (1976), *cert. denied,* 280 Md. 727 (1977). The LEOBR grants extensive rights to law enforcement officers that are not available to the general public. *See Nichols v. Baltimore Police Dep't,* 53 Md.App. 623, 627, 455 A.2d 446, *cert. denied,* 296 Md. 111 (1983).

The LEOBR sets forth specific standards for the investigation of a law enforcement officer's alleged misconduct. Art. 27, § 728(b). "The procedural safeguards afforded to the officer during the official inquiry into his conduct constitute the heart of the Act's protections." *DiGrazia,* 288 Md. at 453, 418 A.2d 1191. If the investigation results in a recommendation that the officer be subject to some action that would constitute a punitive measure, then the officer is entitled to a full hearing. Art. 27, § 730(a).

Judge Alpert, speaking for this Court in *City of Hagerstown v. Moats,* 81 Md.App. 623, 568 A.2d 1181 (1990), *aff'd,* 324 Md.

519, 597 A.2d 972 (1991), explained the nature of the LEOBR hearings under Art. 27, § 730:

> [T]he [LEOBR] hearings approximate a full-blown trial in circuit court. Both the law enforcement agency and the officer may be represented by counsel. The parties present evidence, which, along with all records and documents, is made part of the record. Witnesses testify under oath, and all parties have the right to cross-examination.

81 Md.App. at 631, 568 A.2d 1181 (citations omitted). Nevertheless, "[n]othing in section 730 requires, or suggests for that matter, that it is the equivalent of a criminal proceeding." *Widomski v. Chief of Police of Baltimore County,* 41 Md.App. 361, 379, 397 A.2d 222, *cert. denied,* 284 Md. 750 (1979). The LEOBR, however, is silent as to the standard of proof to be applied before a hearing board or an alternate hearing board.

Officer Meyers was charged with violating Montgomery County Police Department Regulation 82–55, Function Code 300, II, Rule 6, which states:

> Officers shall use force only in accordance with law and departmental procedures and shall not use more force than is reasonably necessary under the circumstances to affect an arrest or protect themselves or citizens from harm. No officer shall use force in a discriminatory manner.

The two administrative allegations against him provided:

*Allegation No. 1—Use of Force*

*TO WIT:* On October 7, 1990, you did hit/beat Mohammed Givpour with your portable radio before and after he had been handcuffed and lying on the ground in the parking lot.

*Allegation No. 2—Use of Force*

*TO WIT:* On October 7, 1990, you did kick and stomp Mohammed Givpour with your foot while Mr. Givpour was lying on the ground handcuffed....

Officer Meyers was found guilty of Allegation No. 2.

In Maryland, there are three standards of proof to test the sufficiency of the evidence: proof by preponderance of the evidence, proof by clear and convincing evidence, and proof

beyond a reasonable doubt. *Wills v. State*, 329 Md. 370, 373–74, 374 n. 1, 620 A.2d 295 (1993); *Weisman v. Connors*, 76 Md.App. 488, 502, 547 A.2d 636 (1988), *cert. denied*, 314 Md. 497, 551 A.2d 868 (1989). We quote the Maryland Pattern Jury Instructions, which provide a clear definition of these standards of proof.

The jury instruction on the preponderance of the evidence standard states:

> To prove by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your minds a belief that it is more likely true than not true.
>
> \*　\*　\*　\*　\*　\*
>
> If you believe that the evidence is evenly balanced on an issue, then your finding on that issue must be against the party who has the burden of proving it.

MPJI 1:8 (2d ed. 1984).

In contrast, the Maryland Pattern Jury Instruction on the clear and convincing standard of proof provides, in part:

> To be clear and convincing, evidence should be "clear" in the sense that it is certain, plain to the understanding, and unambiguous and "convincing" in that sense that it is so reasonable and persuasive as to cause you to believe it.

MPJI 1:8b (2d ed. 1984). *See also Wills*, 329 Md. at 374 n. 1, 620 A.2d 295 (1993); *Berkey v. Delia*, 287 Md. 302, 317–20, 413 A.2d 170 (1980).

Finally, the Pattern Jury Instruction on the beyond a reasonable doubt standard states, in part:

> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. . . . However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. It is not a fanciful doubt, a whimsical doubt or a capricious doubt. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs....

MPJI–Cr. 2:02 (1991). *See also Wills*, 329 Md. at 375–85, 620 A.2d 295 (1993).

In this first issue, Officer Meyers argues that the circuit court, the chief of police, and the AHB applied an incorrect principle of law. Under Issue I, therefore, this Court may substitute its judgment for that of the circuit court, chief of police, and AHB if our interpretation of the relevant legal principles is different. *See Perini Serv., Inc. v. Md. Health Resources Planning Comm'n*, 67 Md.App. 189, 201, 506 A.2d 1207, *cert. denied*, 307 Md. 261, 513 A.2d 314 (1986).[3]

*Maryland Case Law*

Officer Meyers claims that *Everett v. Baltimore Gas & Elec. Co.*, 307 Md. 286, 513 A.2d 882 (1986), *First Nat'l Bank of S. Md. v. U.S.F. & G. Co.*, 275 Md. 400, 340 A.2d 275 (1975), and *Rent–A–Car Co. v. Globe & Rutgers Fire Ins. Co.*, 161 Md. 249, 156 A. 847 (1931), indicate that because the allegations against him included criminal behavior, the clear and convincing standard should have been applied to the LEOBR pro-

---

**3.** At oral argument Officer Meyers declined to argue that the State Administrative Procedure Act on contested cases, Md.State Gov't Code Ann. § 10–201 to –217 (1993), applied to the present case. The County and the Police Department asserted that the Act did apply, but were unable to refer this Court to any relevant authority in support of their position. We do not apply the State Administrative Procedure Act in our review of this case. We observe that House Bill 877, 1993 Md. Laws ch. 59, § 10–217, establishes the preponderance of the evidence as the evidentiary standard to be applied in all contested cases under the State Administrative Procedures Act, unless the clear and convincing standard is imposed on the agency by regulation, statute, or constitution.

ceedings in question. We discuss these cases in reverse chronological order.

In *Everett v. Baltimore Gas & Elec. Co,* 307 Md. 286, 513 A.2d 882 (1986), B.G. & E. wished to terminate a customer's service. After receiving notice that her service would be terminated and after the utility explained its grounds for the proposed termination, the customer filed a complaint with the Public Service Commission (the Commission).

B.G. & E.'s response to the customer's complaint alleged that the customer had, in essence, fraudulently used gas and electric service supplied by the utility by applying for service under a fictitious name. The utility also alleged that the customer, after her service had been denied for non-payment, had her service restored without B.G. & E.'s knowledge or permission. The first charge against the customer amounted to an allegation of fraud, which must be proven by clear and convincing evidence in a civil proceeding. *Peurifoy v. Congressional Motors, Inc.,* 254 Md. 501, 517, 255 A.2d 332 (1969). In addition, the second charge alleged that the customer had engaged in criminal conduct in violation of Art. 27, § 192.

The case was referred to a hearing examiner. Following the hearing, the hearing examiner issued a proposed order and concluded that B.G. & E. bore the burden of proof and had to satisfy that burden by clear and convincing evidence. The utility appealed to the Commission, which determined that the appropriate standard of proof was preponderance of the evidence. In applying the preponderance standard to the record before the hearing examiner, the Commission concluded that B.G. & E. had met its burden of establishing fraudulent and illegal use by the customer. The Commission, therefore, dismissed the customer's complaint.

The customer appealed the Commission's order to the Circuit Court for Baltimore City. The circuit court determined that clear and convincing was the appropriate standard and reversed the Commission's order and remanded the case to the Commission for further proceedings.

B.G. & E. and the Commission appealed to the Court of Special Appeals. This Court, for various reasons, applied the preponderance of the evidence test. The customer appealed to the Court of Appeals, which held that the clear and convincing standard was the applicable evidentiary test.

The Court of Appeals first recognized that the preponderance of the evidence standard was generally applicable in civil and administrative proceedings. *Everett*, 307 Md. at 301, 513 A.2d 882. Nevertheless, the Court stated, "certain cases require a more exacting standard because of the seriousness of the allegations." *Id.* The *Everett* Court then discussed, at length, its decisions in *First Nat'l Bank of S. Md. v. U.S.F. & G. Co.*, 275 Md. 400, 340 A.2d 275 (1975) and *Rent–A–Car Co. v. Globe & Rutgers Fire Ins. Co.*, 161 Md. 249, 156 A. 847 (1931). Ultimately, the Court held:

> [W]here a utility alleges that a customer engaged in conduct amounting to fraud or to a crime and such conduct constitutes the sole basis of the customer's alleged responsibility for prior unpaid bills, the utility must prove its allegation by clear and convincing evidence to justify termination for service of non-payment.

*Everett*, 307 Md. at 304, 513 A.2d 882.

Officer Meyers contends that, because of the seriousness of the allegations against him, the higher standard of proof—clear and convincing—should apply. Meyers is correct that if these allegations were brought against him in another forum, they could constitute criminal behavior: assault and/or battery.[4] Nevertheless, Officer Meyers's reliance on *Everett* is misplaced.

We believe the Court of Appeals decision in *Everett* is grounded, in part, on the special nature of the Commission. The General Assembly gave the Commission broad jurisdic-

---

**4.** If brought as the civil analog in a suit for damages, however, the preponderance of the evidence standard would clearly apply. *Stockham v. Malcolm*, 111 Md. 615, 617, 74 A. 569 (1909).

tion and powers over all public service companies. Md.Ann. Code art. 78, §§ 1 to 107 (1991 & Supp.).

> The powers of the Commission shall be liberally construed; and the Commission shall have the powers specifically conferred by this article and by any other law, and also implied and incidental powers necessary and proper to carry out effectually the provisions of this article.

Art. 78, § 1. This Court, in *People's Counsel v. Public Serv. Comm'n*, 52 Md.App. 715, 451 A.2d 945 (1982), *cert. denied*, 295 Md. 441 (1983), commented on the broad discretion granted to the Commission:

> A great deal of discretion is necessarily vested in the Commission in order that it may properly discharge its important and complex duties. Commission decisions are presumptively correct, and, though subject to judicial review, they are to be affirmed unless found to be illegal or unsupported by substantial evidence.

*Id.* at 722, 451 A.2d 945. Article 78, § 97 provides, in pertinent part:

> **§ 97. Scope of review.**
>
> Every final decision, order, rule or regulation of the Commission shall be prima facie correct. . . .

Because the Commission's decisions are given such deference by the courts of this State, it is not surprising that the Court of Appeals would impose a higher evidentiary standard when a utility alleges that a customer engaged in conduct that amounted to fraud or a crime. Indeed, it is imperative that the Commission correctly dispose of a dispute because of the deferential review given to its decisions.

In addition, the Commission must conduct its proceedings either en banc or in panels of not less than three Commissioners. Art. 78, § 20(a). The Commission may, however, include one hearing examiner on a panel, in lieu of a third commissioner. *Id.* Furthermore, "[t]he Commission may delegate to a hearing examiner, or any commissioner, the authority to conduct any proceeding within its jurisdiction." Art. 78, § 20(b). Orders of a panel are final. Art. 78, § 20(c). A proposed

order of a hearing examiner becomes final unless an appeal is noted by a party to the proceeding within 30 days of the filing of that order. *Id.*

In contrast, under the LEOBR, Officer Meyers elected to appear before an alternate hearing board. The AHB was comprised of an attorney, a Montgomery County Police Captain, and a Montgomery County Police Officer. These individuals are all "laypersons" who do not specialize in presiding over proceedings or hearing disputes under the LEOBR, even though some of them may be trained police officers. *See Widomski v. Chief of Police of Baltimore County,* 41 Md.App. 361, 380, 397 A.2d 222, *cert. denied,* 284 Md. 750 (1979). In addition, the chief of police must review the findings, conclusions, and recommendations of a hearing board. The chief of police then issues a final order that is binding and appealable.[5]

Consequently, the expertise the Commission brings to its proceedings, as opposed to the LEOBR proceedings that are conducted by laypersons, and the heightened judicial deference given to Commission decisions, as compared to other administrative agencies,[6] may also explain the imposition of the clear and convincing evidentiary standard by the Court of Appeals in *Everett.*

The *Everett* decision is also grounded, in part, on the fact that one of the charges made by B.G. & E. against the customer amounted to an allegation of fraud. In Maryland, there is a long common-law tradition of applying the clear and convincing evidentiary standard in civil fraud cases. See *Krouse v. Krouse,* 94 Md.App. 369, 378–79, 617 A.2d 1098 (1993), and cases cited therein. An allegation of fraud is not

---

**5.** There are a limited number of situations where the decisions of a hearing board as to findings of fact and punishment are final. *See* Art. 27, § 731(d)(1).

**6.** The Maryland State Board of Education interpretations of the public education law are also accorded heightened deference by reviewing courts. *Strother v. Board of Educ. of Howard County,* 96 Md.App. 99, 110, 623 A.2d 717 (1993).

present in Meyers's case, consequently, that basis for the *Everett* decision is inapposite to the case at bar.

Finally, the present case, unlike *Everett,* involves an internal dispute between a public employee and the agency, the Montgomery County Police Department, that employs him. *See Cancelose v. City of Greenbelt,* 75 Md.App. 662, 666, 542 A.2d 1288 (1988); *Abbott v. Administrative Hearing Bd., Prince George's County,* 33 Md.App. 681, 688, 366 A.2d 756 (1976), *cert. denied,* 280 Md. 727 (1977).

For these reasons we believe that *Everett* is distinguishable from the case before us. We, therefore, decline to apply its holding to the present proceedings that were conducted under the LEOBR.

Officer Meyers also relies on *First Nat'l Bank of S. Md. v. U.S.F. & G. Co.,* 275 Md. 400, 340 A.2d 275 (1975), to support his contention that the LEOBR proceedings in question required application of the clear and convincing standard of proof. In that case, the First National Bank of Southern Maryland brought an action against U.S.F. & G., the Bank's insurer, on a fidelity bond for the recovery of losses the Bank incurred as a result of a Bank employee's allegedly dishonest and fraudulent acts. The Bank claimed that the employee's conduct fell within the terms of the fidelity bond, which covered, *inter alia,* "[a]ny loss through any dishonest, fraudulent or criminal act of any of the Employees . . . ." The Court of Appeals stated:

> When fraud, dishonesty or criminal conduct is imputed, something more than a mere preponderance of evidence must be produced; the proof must be "clear and satisfactory" and be of such a character as to appeal strongly to the conscience of the court.

*First Nat'l Bank of S. Md.,* 275 Md. at 411, 340 A.2d 275.

Officer Meyers also refers us to *Rent–A–Car Co. v. Globe & Rutgers Fire Ins. Co.,* 161 Md. 249, 156 A. 847 (1931), as further support for his argument that the clear and convincing standard of proof is applicable to the present proceedings that were conducted under the LEOBR. In that case, a car rental

company brought suit against its insurer when the insurer failed to pay a loss resulting from a fire. The insurer argued in its defense that the insured had intentionally started the fire that caused the loss in an effort to defraud the insurer. Following a judgment for the insurer, the insured appealed. The Court of Appeals reversed on the basis that a jury instruction required the defendant to prove its allegation of fraud by a preponderance of the evidence. *Id.* at 267, 156 A. 847. The Court stated:

> The defense in this case amounted to a charge that the appellant, its officers and employee, had committed a serious criminal offense. In such cases the rule in England is that even in civil cases something more than a mere preponderance of evidence is required to establish guilt, and, whatever the law may be elsewhere, that appears to be the law of this state.
>
>     \*       \*       \*       \*       \*       \*
>
> [T]he general rule is stated as follows in *Jones on Evidence,* sec. 195: "When fraud or criminal conduct is imputed the decisions frequently declare that something more than a mere preponderance of evidence must be produced, and that the proof must be clear and satisfactory."

*Id.* at 267–68, 156 A. 847 (citations omitted).

Officer Meyers would have us read these two cases as requiring that the clear and convincing standard be applied to the disputed proceedings under the LEOBR because the allegations against Meyers amounted to an allegation of criminal conduct. We decline to read these cases in that light. We believe that *Rent–A–Car Co.* and *First Nat'l Bank of S. Md.* merely stand for the proposition that while the clear and convincing standard must be applied in a civil proceeding in which fraud, dishonesty, or criminal conduct is alleged, this requirement does not automatically extend to administrative proceedings. Indeed, the Court of Appeals in *Everett,* after discussing *Rent–A–Car Co.* and *First Nat'l Bank of S. Md.,* stated, "Thus, where allegations involve fraud or criminal conduct, something more than a preponderance of the evi-

dence *may* be required in proving these charges." 307 Md. at 302, 513 A.2d 882 (emphasis supplied). In addition, the Court of Appeals summarized its holding in *Everett* by stating:

> In sum, where a utility alleges that a customer engaged in conduct amounting to fraud or to a crime and such conduct constitutes the sole basis of the customer's alleged responsibility for prior unpaid bills, the utility must prove its allegation by clear and convincing evidence to justify termination of service for non-payment.

307 Md. at 304, 513 A.2d 882. The Court of Appeals was very fact specific in its holding and thus appears to have been responding to the particular situation before it. Although the Court relied on *Rent–A–Car Co.* and *First Nat'l Bank of S. Md.* to reason its way to its holding, we do not believe the Court intended for its use of these cases to extend to every administrative proceeding where the underlying allegation amounts to otherwise criminal conduct.

Our review of the contemporary case law of our sister states addressing similar questions supports our view. *Board of Education of City of Chicago v. State Board of Education*, 113 Ill.2d 173, 100 Ill.Dec. 715, 720–24, 497 N.E.2d 984, 989–93 (1986) (proper standard of proof applicable to tenured-teacher dismissal proceedings, including those where conduct that might constitute crime is charged, is preponderance of the evidence standard); *In the Matter of D'Angelo*, 105 N.M. 391, 733 P.2d 360, 361–62 (1986) (in attorney disciplinary proceeding, standard of proof in administrative hearing is preponderance of the evidence, absent allegation of fraud or statute or court rule requiring higher standard); *Jordan v. Roberts*, 161 W.Va. 750, 246 S.E.2d 259, 262 (1978) (unless altered by statute, in administrative hearing before motor vehicle commissioner considering suspension of operator's permit for refusing to submit to breathalyzer, the general rule is that required degree of proof is preponderance of the evidence); *Pelling v. Illinois Racing Board*, 214 Ill.App.3d 675, 158 Ill.Dec. 322, 325–26, 574 N.E.2d 116, 119–20 (1991) (preponderance of the evidence, rather than clear and convincing evidence standard, applied to a proceeding before the Racing

Board in which a race horse driver was charged with unsatisfactory driving).

## Procedural Due Process

Officer Meyers next argues that the Due Process Clause of the Fourteenth Amendment of the United States Constitution [7] and Article 24 of the Maryland Declaration of Rights [8] "suggest" that the clear and convincing standard of proof is constitutionally required.

"Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the United States Supreme Court developed a balancing test that it still utilizes in deciding procedural due process questions.

[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

**7.** Officer Meyers simply refers to the "due process clause of the U.S. Constitution"; we presume he means the Due Process Clause of the Fourteenth Amendment.

**8.** Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution have the same meaning. *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052 (1980).

*Id.* at 334–35, 96 S.Ct. at 903. "Procedural due process . . . requires that administrative agencies performing adjudicatory or quasi-adjudicatory functions observe the basic principles of fairness as to parties appearing before them." *Maryland State Police v. Zeigler,* 330 Md. 540, 559, 625 A.2d 914 (1993). As stated by one of the learned treatises:

> The essential guarantee of the due process clause is that of fairness. The procedure must be fundamentally fair to the individual in the resolution of the factual and legal basis for the government actions which deprive [the individual] of life, liberty or property. While different situations may entail different types of procedures, there is always the general requirement that the government process be fair and impartial.

John E. Nowack et al., *Constitutional Law,* ch. 15 § III.B., at 557–58 (1983).

In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the appellant was found mentally ill and involuntarily committed to a state mental hospital for an indefinite period of time in a civil proceeding. The trial court had instructed the jury that it had to determine whether the appellant was mentally ill and required hospitalization for his own protection and the protection of others, "[b]ased on clear, unequivocal and convincing evidence." The appellant appealed to the Texas Court of Civil Appeals, arguing, *inter alia,* that any standard of proof for civil commitments less than the criminal standard—beyond a reasonable doubt—violated his procedural due process rights. The Court of Civil Appeals agreed with the appellant and reversed the trial court. On appeal, the Texas Supreme Court reversed the lower appellate court, reinstated the trial court judgment, and held that the preponderance of the evidence standard satisfied due process in a civil commitment proceeding.

The U.S. Supreme Court vacated the Texas Supreme Court's decision and held that the standard employed by the trial court—clear, unequivocal, and convincing evidence—was "constitutionally adequate." 441 U.S. at 433, 99 S.Ct. at 1813.

The Supreme Court stated that the function of a standard of proof:

> is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. [358] 370 [90 S.Ct. 1068, 1075, 25 L.Ed.2d 368] (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

441 U.S. at 423, 99 S.Ct. at 1808.

The Supreme Court recognized that there is a continuum of three standards of proof.

> At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.
>
> In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt.
>
> The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal," and "convincing," is less commonly used but nonetheless "is no stranger to the civil law." *Woodby v. INS*, 385 U.S. 276, 285 [87 S.Ct. 483, 488, 17 L.Ed.2d 362] (1966). One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed

to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof.

441 U.S. at 423–24, 99 S.Ct. at 1808 (footnote omitted) (some citations omitted). The Supreme Court then applied the balancing test it developed in *Mathews v. Eldridge* and determined that the clear and convincing standard of proof was constitutionally adequate and met the requirements of due process.

In a later case, *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), a family court in New York State terminated the Santoskys' parental rights in their natural children after finding, based upon a "fair preponderance of the evidence," that they had permanently neglected their children. The New York Supreme Court, Appellate Division, affirmed the family court's use of the preponderance of the evidence standard. The New York Court of Appeals dismissed the Santoskys' appeal to that court. The U.S. Supreme Court, after applying the three factors set forth in *Mathews v. Eldridge*, concluded that, in parental rights termination proceedings, the fair preponderance of the evidence standard was inconsistent with due process.

Turning to the case *sub judice*, under *Mathews v. Eldridge*, we must first examine "the private interest that will be affected by the official action." 424 U.S. at 335, 96 S.Ct. at 903. The permanency of the loss must also be considered. *Santosky*, 455 U.S. at 758, 102 S.Ct. at 1397. Following a hearing under the LEOBR, an officer who is found guilty of the allegations filed against him may receive punishment "including but not limited to demotion, dismissal, transfer, loss of pay, reassignment, or other similar action which would be considered a punitive measure." Art. 27, § 731(b). Officer Meyers received a letter of reprimand in his personnel file.

Unfortunately, Officer Meyers has not presented any substantial evidence or argument bearing on the nature of his interest other than a reference to his "professional reputa-

tion." Although Officer Meyers's potential punishment could have been his dismissal from the Montgomery County Police Department, he fails to present any argument or support for the proposition that he has a vested property interest in his continued employment with the County Police Department. He does not refer this Court to any section of the Montgomery County Code, Montgomery County Police Department Regulation, or County employee policy that would lead us to conclude that he is a tenured police officer. Absent a showing that he is covered by some tenure provision, Officer Meyers does not possess a protected property right to continued employment by the Montgomery County Police Department. *See Elliott v. Kupferman,* 58 Md.App. 510, 520–21, 473 A.2d 960 (1984). The only reference Officer Meyers makes to the nature of his interests comes in the final sentence of his argument in his brief for this issue. That sentence provides:

"Nonetheless, [the preponderance of the evidence] was the standard employed in this administrative hearing, conducted with all the indicia of a criminal trial, to determine a veteran police officer's guilt or innocence, *and which directly impacts his professional reputation.*" (Emphasis supplied).

This interest in his professional reputation is not a property interest.

Nevertheless, the letter of reprimand in Officer Meyers's personnel file may implicate a liberty interest. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *see also Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 572–73, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). An individual's interest in his or her reputation, by itself, however, does not give rise to a protected liberty interest. *Paul v. Davis,* 424 U.S. 693, 701–12, 96 S.Ct. 1155, 1160–65, 47 L.Ed.2d 405 (1976). In *Paul,* the Supreme Court explained that reputation alone, absent a more tangible interest, such as employment, is insufficient to give rise to the

procedural protections contained in the Due Process Clause. *Id.* at 701, 96 S.Ct. at 1160.

Officer Meyers claims only that the LEOBR proceedings had a direct impact on his professional reputation. He does not present any argument to this Court on the effects, if any, that the letter of reprimand may have on his present and/or future employment. Consequently, we question whether Officer Meyers has a liberty interest that triggers the due process protections.

A deprivation of liberty may also occur, however, when county action has worked any change of a police officer's status as theretofore recognized under the County's laws or Police Department's regulations. *See Paul,* 424 U.S. at 712, 96 S.Ct. at 1165. We believe that there are professional consequences to Officer Meyers that result from having the letter of reprimand in his personnel file, such as the possibility of delayed promotion. Therefore, although Officer Meyers failed to draw the specific consequences to our attention, we proceed, for purposes of this discussion under the assumption that the letter of reprimand in his personnel file implicates a protected liberty interest.

The next factor to be weighed in accordance with *Mathews v. Eldridge* is "the risk of an erroneous deprivation of [Officer Meyers's] interest through the proceedings used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903. The *Santosky* Court stated that *Mathews* requires that we consider "both the risk of erroneous deprivation of private interests resulting from use of a 'fair preponderance' standard and the likelihood that a higher evidentiary standard would reduce that risk." *Santosky v. Kramer,* 455 U.S. 745, 761, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982). We must also determine whether the preponderance of the evidence standard fairly allocates the risk of an erroneous factfinding between the two parties. *Id.*

Officer Meyers argues that a LEOBR hearing contains the indicia of a criminal trial for the following reasons: (1) A LEOBR hearing is controlled by Md.Ann.Code art. 27, which

is the State article on Crimes and Punishments; (2) Section 731(a) provides for a finding of "not guilty" or "guilty" as the verdict options; (3) Section 731(b) provides that if the officer is found "guilty," the hearing board recommends appropriate "punishment."

Officer Meyers further argues that a hearing conducted under the LEOBR has much of the evidentiary formality of a criminal trial, including: (1) "An official record, including testimony and exhibits, shall be kept of the hearing." Art. 27, § 730(a); (2) Sections 730(e)–(i) provide for the use of formal rules of evidence; and (3) "Any decision, order, or action taken as a result of the hearing shall be in writing and shall be accompanied by findings of fact." Art. 27, § 731(a).

Officer Meyers also refers this Court to the disparity of litigation resources between the two parties. He relies on *Santosky,* 455 U.S. at 763, 102 S.Ct. at 1400, to contend that the County's ability to assemble a case dwarfs a police officer's ability to present a defense. Meyers claims that there is no limit on the amount the County may spend in prosecuting a proceeding under the LEOBR.

We agree with Officer Meyers that the LEOBR proceedings have some indicia of a criminal trial. Nevertheless, we must not lose sight of the fact that they are, in reality, administrative proceedings conducted by laypersons. *See Widomski v. Chief of Police of Baltimore County,* 41 Md.App. 361, 380, 397 A.2d 222, *cert. denied,* 284 Md. 750 (1979). This Court has stated, "Nothing in section 730 requires, or suggests for that matter, that it is the equivalent of a criminal proceeding" *Id.* 41 Md.App. at 379, 397 A.2d 222. In *Widomski,* this Court refused to require a hearing board constituted under the LEOBR to "adhere strictly to the rules of criminal procedure." *Id.* at 380, 397 A.2d 222. Nor do we believe that a finding of "guilty" or "not guilty" or the imposition of "punishment" transforms the LEOBR proceedings into a criminal or quasi-criminal trial. The LEOBR proceedings are disciplinary in nature and this results in the labels placed on the findings of a hearing board.

Furthermore, although the LEOBR sets forth certain evidentiary guidelines, "administrative agencies are not generally bound by the technical common-law rules of evidence. . . ." *Montgomery County v. National Capital Realty Corp.*, 267 Md. 364, 376, 297 A.2d 675 (1972). Administrative agencies must simply "observe the basic rules of fairness as to parties appearing before them. Thus, even hearsay evidence may be admitted in contested administrative proceedings." *Id. See, e.g., Maryland Dep't of Human Resources v. Bo Peep Day Nursery*, 317 Md. 573, 595, 565 A.2d 1015 (1989) ("procedural due process does not prevent an agency from supporting its decision *wholly* by hearsay, if there is underlying reliability and probative value"), *cert. denied sub nom. Cassilly v. Maryland Dep't of Human Resources*, 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990).

Furthermore, § 731(a) actually gives the officer greater protection than that afforded to a criminal defendant because the decision of the Board must be in writing and accompanied by findings of fact. A criminal defendant may be convicted of the crime with which he or she is charged and, if tried by a jury, the defendant only sees the verdict sheet and hears the jury foreperson pronounce the finding of guilt or innocence. The verdict sheet is not accompanied by findings of fact. In a bench trial, the judge may simply orally rule from the bench that the defendant is guilty and not state any reasons for his or her ruling. Other than the entry on the docket sheet, the defendant is not assured of receiving a decision or order from the trial court.

Nor are we persuaded by Officer Meyers's argument that the County's ability to assemble a case dwarfs his ability to present a defense. The concerns raised by the Supreme Court in *Santosky, supra,* included: (1) the unusual discretion of the court to "underweigh probative facts that might favor the parent," 455 U.S. at 762, 102 S.Ct. at 1399; (2) the State's attorney's access to all public records concerning the family; (3) the State's ability to call expert witnesses; (4) the fact that the State's primary witnesses would be its own caseworkers "whom the State has empowered both to investigate the family

situation and to testify against the parents," *id.* at 763, 102 S.Ct. at 1400; and (5) the State's "power to shape the historical events that form the basis for termination" of the parents' rights, *id.* at 763, 102 S.Ct. at 1400. Such concerns are not present in the case before us. As previously discussed, the LEOBR provides a police officer with extensive procedural safeguards. The preponderance of the evidence standard, thus, properly allocates the burden between the County and Officer Meyers.

Finally, under *Mathews v. Eldridge,* we consider "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. at 903. Although a heightened evidentiary standard would impose a limited, if any, increased administrative burden on the County and the Police Department, we must weigh heavily in their favor their interest in the internal discipline of the Police Department. The enumerated functions of the Montgomery County Police Department are:

(1) The protection of life and property.

(2) The preservation of peace and order.

(3) The prevention and detection of crime.

(4) The arrest of violators of the law.

(5) The enforcement of all laws and ordinances.

(6) The prompt service of all summonses and court papers as required by law.

Montgomery County Code, ch. 35, § 21 (1984). Without internal discipline the Police Department would be unable to carry out these functions. In addition, the County and the Police department have a strong interest in the relations between the police department and the community the department serves. Cooperation between the community and the police department is imperative for effective police work. The County and the Police Department, thus, have a strong interest in a credible and professional police force.

For all of the foregoing reasons we hold that the circuit court, the chief of police, and the alternate hearing board did

not err when they used the preponderance of the evidence standard rather than the clear and convincing standard in their determination that Officer Meyers had violated Montgomery County Police Department Regulation 82–55, Function Code 300, II, Rule 6.

### Claims Raised by Officer Meyers at Oral Argument

Officer Meyers raised three contentions at oral argument. He first argued that although a police officer's statement may be protected from discovery in a subsequent criminal prosecution, Art. 27, § 728(b)(7)(ii), it is not clear that an officer's statement is not protected from discovery in a subsequent civil proceeding against the officer. Officer Meyers claimed that this leaves him particularly vulnerable to civil liability.

We fail to see how a heightened evidentiary standard of proof would protect the officer if his or her statement was discoverable. If the statement is subject to discovery for purposes of a civil proceeding against the officer, the evidentiary standard of proof before a hearing board would have no effect on the use of the statements in a later proceeding.

Officer Meyers next claimed that a finding by the AHB that he violated a departmental regulation could expose him to a negligence action. First, Officer Meyers's exposure to a negligence action is, in fact, based on his conduct, not his violation of the departmental regulation. In addition, under Maryland law, the violation of a statute does not constitute negligence *per se,* but establishes only a *prima facie* case of negligence.[9]

> [T]he breach of a statutory duty may be considered some evidence of negligence where three requirements are met. First, the plaintiff must be a member of the class of persons the statute was designed to prevent. Second, the injury suffered must be of the type the statute was designed to

---

**9.** This principle also applies to county ordinances. *Slack v. Villari,* 59 Md.App. 462, 470, 476 A.2d 227 (1984). We proceed, for purposes of this discussion, under the assumption that this principle also applies to the violation of the Montgomery County Police Department Regulations.

protect. Third, the plaintiff must present legally sufficient evidence to demonstrate that the statutory violation was the proximate cause of the injury sustained.

*Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 362, 517 A.2d 1122 (1986).

In Officer Meyers's final contention raised at oral argument he claimed that the finding of guilt by the AHB would establish a *prima facie* case against him under 42 U.S.C. § 1983 (1988). We disagree with Officer Meyers's contention and explain.

A plaintiff, in order to sustain a § 1983 action, must demonstrate that: "(1) the conduct was under color of state law; (2) the conduct deprived the plaintiff of constitutional rights; and (3) the deprivation occurred without due process of law." *Rhodes v. McDannel,* 945 F.2d 117, 119 (6th Cir.1991). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred...." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that *"all* claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395, 109 S.Ct. at 1871 (emphasis in original). The Court held that the inquiry was an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. at 1872.

Our review of § 1983 actions brought by plaintiffs on grounds of excessive force used by police officers or prison officials reveals that a violation of police regulations or state law by the defendants, standing alone, did not establish a constitutional violation. *See, e.g., Russo v. City of Cincinnati,* 953 F.2d 1036, 1044–45 (6th Cir.1992) (trial court erred in

failing to grant summary judgment in favor of defendant police officer even though officer used taser on victim in violation of departmental policy); *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990) ("not every instance of force proscribed by state law rises to the level of a constitutional violation so as to support a section 1983 action"); *King v. Blankenship,* 636 F.2d 70, 73 (4th Cir.1980) ("not every instance of the use of excessive force gives rise to a cause of action under § 1983 merely because it gives rise to a cause of action under state tort law or is prosecutable under criminal assault and battery law"). Consequently, the Board's finding that Officer Meyers violated the Montgomery County Police Department Regulation does not, in itself, expose him to liability under § 1983.

In sum, we hold that the circuit court, the chief of police, and the Alternate Hearing Board did not err when they used the preponderance of the evidence standard rather than the clear and convincing standard in their determination that Officer Meyers had violated the police department regulation.

.II.

■ Officer Meyers also contends that the decisions of the circuit court, chief of police, and the Alternate Hearing Board were not supported by substantial evidence. In its memorandum to the Chief of Police, the AHB concluded that it was

demonstrated by a preponderance of the evidence that Officer Meyers kicked and stomped Mr. Givpour after he was handcuffed on the ground and offering no further resistance. On this particular point, events subsequent to handcuffing, all three witnesses stated that their vision was no longer obscured and they observed Officer Meyers' foot kick, step down and move back and forth on the back of Mr. Givpour.

■ Our review of the LEOBR proceedings is limited to determining whether there was substantial evidence to support the AHB's findings.

A reviewing court may, and should, examine any inference, drawn by an agency, of the existence of a fact not shown by direct proof, to see if the inference reasonably follows from other facts which are shown by direct proof. If it does, even though the agency might reasonably have drawn a different inference, the court has no power to disagree with the fact so inferred.

A reviewing court may, and should, examine any conclusion reached by an agency, to see whether reasoning minds could reasonably reach that conclusion from facts in the record before the agency, by direct proof, or by permissible inference. If the conclusion could be so reached, then it is based upon substantial evidence, and the court has no power to reject that conclusion.

A reviewing court may, and should, examine facts found by an agency, to see if there was evidence to support each fact found. If there was evidence of that fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact.

*Jacocks v. Montgomery County,* 58 Md.App. 95, 110–11, 472 A.2d 485 (1984) (quoting *Commissioner, Baltimore City Police Dep't v. Cason,* 34 Md.App. 487, 508, 368 A.2d 1067, *cert. denied,* 280 Md. 728 (1977)).

We disagree with Officer Meyers's contentions because there was substantial evidence before the AHB to support its findings. Mrs. Richards, a neighbor who observed the altercation between Officers Meyers and Diggs and Mr. Givpour, gave the following testimony:

Q: Did there come a time that you changed positions, you moved from where you were standing when you said you were standing next to your husband?

A: Yes. One time I was standing near to my husband, and I saw Officer Meyers, you know, just come down so hard on Mr. Givpour, and Mr. Givpour loud moaned [sic]. I walked

over in the middle of the vehicles where I could see every-
thing. When I walked over, Officer Meyer[s's] foot was on
Mr. Givpour back and he was swizzling his foot onto his
back.

       \*      \*      \*      \*      \*      \*

Q: During the time that ... you were positioned so that
you were between the two cars and you could see Mr.
Givpour and you could see him handcuffed, did you see the
officers beating Mr. Givpour?

A: At that time, no. The onliest [sic] thing I observed is
where Officer Meyers had his foot swizzling in Mr.
Givpour's back. That's the onliest time I, that's the onliest
thing I observed at that time.

Mrs. Richards estimated that she was three feet from Officer
Meyers when she saw his foot on Mr. Givpour's back. Mrs.
Richards also demonstrated for the AHB what she meant by
the word "swizzling," which she had used to describe Officer
Meyers's actions.[10] Mrs. Richards testified that she did not
see Mr. Givpour kick the officers after he was handcuffed
because she was able to see both his legs extended out behind
him as he lay flat on his stomach in the parking lot.

Mr. Richards also changed his position to gain a better view
of the struggle between Mr. Givpour and the officers. After
moving to a position from which Mr. Richards could see the
lower portion of Mr. Givpour's body, he stated that he could
actually see that Mr. Givpour was handcuffed and lying on his
stomach. It was at that time that Mr. Richards saw Officer
Meyers's foot on Mr. Givpour's body. Mr. Richards stated
that Mr. Givpour was lying on his stomach and was not
moving at that time.

_____

**10.** It is not clear from the testimony as to what Mrs. Richards meant by
her use of the word "swizzling," but she did demonstrate what she
meant for the AHB. The AHB memorandum to the chief of police
states that the witnesses observed Officer Meyers's foot "step down and
move back and forth on the back of Mr. Givpour." Therefore, we are
led to the conclusion that "swizzling" connotes some type of back and
forth (grinding ?) motion.

Mr. Borda, another neighbor, testified as to what he observed as he stood on the front steps of his town house:

I assumed they [Officers Meyers and Diggs] were handcuffing him because after a point. . . . [t]hey stood up and kind of relaxed, and he just stayed laying there on the ground, kind of on his side. . . . And so they stood up and, and kind of relaxed, and that's why, you know, I figured they'd handcuffed him. But then after that point that's when I saw the white officer [Officer Meyers] . . . kick a couple of times into the area. It was all behind the car. So he kicked into the area which I would have assumed was about the middle of the body, the abdomen or something, and come down with the walkie-talkie, maybe three, four times, and what I thought was around the head or shoulders. And you know, I couldn't see where that . . . because that was behind the car, but at one point I did see . . . coming down with the foot and stomping down on the leg area around the knees, and I did see that because the legs were . . . sticking out of the car.

Q: So you did observe which officer stomping on the legs . . .

A: The white officer.

*  *  *  *  *  *

A: Well, I saw him just . . . stomp down on the side of his leg. And he came down on the side of the leg, around the knee.

Although Mr. Borda did not observe that Mr. Givpour was handcuffed, he described the actions of the officers that led him to believe that they had handcuffed Mr. Givpour. It was after Mr. Borda believed that the officers had handcuffed Mr. Givpour that he observed Officer Meyers stomp on Mr. Givpour's leg. Based on Mr. Borda's testimony that the officers stood and relaxed and Mr. Givpour remained lying on the ground it is a reasonable inference that Mr. Givpour was, in fact, handcuffed at that time.

In sum, we hold that the findings of the AHB, the chief of police, and the circuit court that Officer Meyers did stomp and

kick Mr. Givpour after Mr. Givpour was handcuffed and no longer resisting is supported by substantial evidence.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**