**James R. CASSEL, Appellant and Cross–Appellee,**

v.

**STATE of Alaska, DEPARTMENT OF ADMINISTRATION, Appellee and Cross–Appellant.**

**Nos. S–9063, S–9073.**

Supreme Court of Alaska.

Dec. 15, 2000.

---

Terry A. Venneberg, Law Offices of Terry A. Venneberg, Anchorage, for Appellant and Cross–Appellee.

Jan Hart DeYoung, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee and Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

James Cassel, a probationary employee, was dismissed from his position as the Department of Public Safety's Identification Bureau Chief. Cassel appeals his termination, claiming that objective grounds did not support his termination. He further claims entitlement to back pay based on a violation of his right to due process. Because Cassel's termination conformed to the objective standards and procedural safeguards required by the collective bargaining agreement, we affirm.

## II. FACTS AND PROCEEDINGS

In January 1994 James Cassel began work as the Department of Public Safety's Identification Bureau Chief, a position charged with the responsibility of managing the State's criminal records and fingerprint identification system.

Under the collective bargaining agreement between the State of Alaska and the Alaska Public Employees Association (APEA), Cassel's position was subject to a twelve-month probationary period. Midway through this probationary period, Cassel received a performance evaluation from his immediate supervisor, Director of Administrative Services Ken Bischoff. Bischoff expressed dissatisfaction with Cassel's job performance, giving him an "unacceptable" rating on his performance and a "low acceptable" overall rating. Cassel did not appeal this evaluation and eventually signed the report.

In September 1994 Bischoff notified Cassel that Cassel would not complete his probationary period and that his employment would be terminated within sixty days. Cassel, through his union, challenged his termination pursuant to the complaint procedures available to probationary employees. At the first two steps of the complaint review process, Cassel's complaint was denied by Bischoff and Commissioner of Public Safety Richard Burton. The third and final step of the complaint process entailed review by the Commissioner of Administration.

In conjunction with this step III complaint review by the Department of Administration, labor relations analyst Mila Doyle met with Cassel and his APEA representative. Following this meeting, Doyle recommended the denial of Cassel's complaint. Ultimately, then-Commissioner of Administration Mark Boyer denied Cassel's complaint and upheld his termination.

Cassel appealed this final decision to the superior court. In a September 1996 order, Superior Court Judge Milton M. Souter determined that under the applicable labor contracts and *University of Alaska v. Tovsen*,[1] Cassel could be terminated "only for good cause." Because no good cause determination had been made, Judge Souter reversed Commissioner Boyer's decision and remanded to the Department of Administration for further proceedings.

---

1. 835 P.2d 445 (Alaska 1992).

Cassel thereafter filed a Motion for Clarification of Remedy, seeking back pay for the State's failure to provide him with an adequate hearing. Judge Souter determined that Cassel's meeting with Doyle conformed to the collective bargaining agreement and provided due process, and therefore denied Cassel's request for back pay.

In May and June of 1997 Hearing Officer Phyllis V. Schmidt held a hearing pursuant to Judge Souter's remand order to determine whether there was good cause to terminate Cassel. In her September 1997 decision, Schmidt concluded that "there was just cause to terminate Mr. Cassel for unsatisfactory performance of his duties."

Cassel appealed Hearing Officer Schmidt's decision to the superior court. Superior Court Judge pro tem Sigurd E. Murphy affirmed, holding that just cause supported Cassel's termination. Judge Murphy also affirmed Judge Souter's ruling that Cassel received due process in the Doyle meeting and was therefore not entitled to back pay.

On appeal, Cassel claims that (1) Hearing Officer Schmidt improperly applied a subjective standard in violation of Judge Souter's order, and (2) he did not receive due process in the Doyle meeting and is therefore entitled to back pay.

On cross-appeal, the State claims that good faith, subjective dissatisfaction with employee performance is sufficient to terminate probationary employees under the collective bargaining agreement.

## III. DISCUSSION

### A. Standard of Review

■■■ "When the superior court acts as an intermediate court of appeal, we review

the merits of the underlying administrative decision independently, giving no deference to the superior court's decision."[2] In reviewing administrative decisions, we apply four principal standards:

the "substantial evidence" test for questions of fact; the "reasonable basis" test for questions of law involving agency expertise; the "substitution of judgment" test for questions of law where no agency expertise is involved; and the "reasonable and not arbitrary" test for review of administrative regulations.[3]

Because the interpretation of a contract is a question of law, we substitute our own judgment.[4] Whether an employee was terminated for just cause or for an illegitimate reason is a question of fact which we review for substantial evidence.[5] Substantial evidence exists when, in light of the whole record, reasonable minds might accept the administrative agency's decision.[6] We do "not independently reweigh the evidence" nor "choose between competing inferences" but "only determine whether such evidence exists."[7] It is a legal question whether the quantum of evidence is substantial.[8]

### B. The State–APEA Collective Bargaining Agreement Required Objective Grounds to Terminate Cassel as a Probationary Employee.

In furtherance of the constitutionally mandated merit principle in public employment,[9] the legislature has required a probationary period for state employees prior to attaining permanent status.[10] This probationary period "is an integral part of the examination process which is to be used to evaluate the

2. Bartlett v. State, Commercial Fisheries Entry Comm'n, 948 P.2d 987, 990 (Alaska 1997).

3. Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd., 991 P.2d 202, 206 (Alaska 1999).

4. See Alaska Hous. Fin. Corp. v. Salvucci, 950 P.2d 1116, 1119 (Alaska 1997).

5. See Jones v. Central Peninsula Gen. Hosp., 779 P.2d 783, 789 (Alaska 1989).

6. See Municipality of Anchorage, Police & Fire Retirement Bd. v. Coffey, 893 P.2d 722, 726 (Alaska 1995) (internal quotation omitted).

7. Id.

8. See Fireman's Fund Am. Ins. Cos. v. Gomes, 544 P.2d 1013, 1015 (Alaska 1976).

9. See Alaska Const. art. XII, § 6.

10. See AS 39.25.150(7); 2 Alaska Administrative Code (AAC) 07.240 (1999).

employee's work and to reject any employee whose performance is not acceptable." [11]

This court has previously addressed the question of whether language in an employment contract required objective grounds for terminating a probationary employee. In *University of Alaska v. Tovsen,* we addressed whether the University of Alaska's personnel regulations required an objective basis for the dismissal of a probationary employee.[12] The University argued that the regulation at issue [13] was analogous to a satisfaction contract that permits the dismissal of the probationary employee upon the employer's subjective, good faith dissatisfaction with the employee's performance.[14] We rejected this argument, determining that "the regulation more clearly resembles an agreement permitting termination only when objective standards of performance are not satisfied." [15] We defined "objective standards" broadly in this context as "standards that exist by reference to external sources such as employee rules and regulations or standards that a reasonable person would use in evaluating an employee's performance." [16] The University regulation referred to objective standards and thus did not resemble a satisfaction contract, under which the employer may terminate an employee as long as the employer, in good faith, is actually dissatisfied with the employee's performance.[17] We

concluded that the wording of the University regulation "suggest[ed] a process involving objective standards rather than mere personal beliefs." [18]

 In the instant case, Judge Souter determined that the State–APEA collective bargaining agreement and the "Rater's Guide to Performance Appraisals" set forth "uniform standards ... [for the] rating of a probationary employee." [19] Because of these uniform standards, Judge Souter reasoned that *Tovsen* applied and that Cassel "was subject to termination only for good cause." In its cross-appeal, the State argues that probationary employees, like at-will employees, may properly be dismissed under the State–APEA agreement upon a supervisor's good faith, personal dissatisfaction with employee performance.

As a matter of contract interpretation, we reject the State's argument and conclude that the State–APEA agreement, like the regulations discussed in *Tovsen,* permits termination only when a probationary employee has failed to satisfy objective standards of performance. First, the State–APEA agreement explicitly requires written performance evaluations of probationary employees.[20] Section 18.17(A) provides that probationary employees "shall receive written performance evaluations." Furthermore, negative perfor-

11. 2 AAC 07.240.

12. 835 P.2d 445, 446–48 (Alaska 1992).

13. University Regulation 04.01.06 provided in part:
> All non-exempt and exempt (non-faculty) employees shall be in probationary status for the first six months of employment. The performance of these employees shall be evaluated prior to the end of the probationary period.
> . . . .
> B. If the employee's performance is found to be unsatisfactory, the employee will be terminated.

*Tovsen,* 835 P.2d at 446 n. 1.

14. *See Tovsen,* 835 P.2d at 446.

15. *Id.* at 447.

16. *Id.* at 447 n. 2.

17. *See id.* at 446 (citing 53 Am.Jur.2d, Master and Servant § 37, at 113 (1970)). Satisfaction contracts typically contain the phrase "as long as

his services are satisfactory to the employer." *Id.* (quoting John C. McCarthy, Recovery of Damages for Wrongful Discharge 2d § 3.53, at 286 (1990)).

18. *Id.* at 447.

19. The State claims the superior court's reference to the Rater's Guide constituted error on the ground that the Rater's Guide was not part of the employment contract. But the Rater's Guide constitutes an "external source" of employee performance standards and was referenced by name in § 18.17(D) of the State–APEA agreement. *See Tovsen,* 835 P.2d at 447 n. 2. We accordingly conclude that the superior court did not err in citing the Rater's Guide.

20. *See Tovsen,* 835 P.2d at 447 ("the regulation itself directs that the performance of probationary employees be evaluated; a probationary employee may be terminated if his or her performance is found to be unsatisfactory.") (internal punctuation omitted).

mance evaluations are explicitly linked to nonretention; raters may recommend personnel actions on the performance evaluations.

■■■ More importantly, the State–APEA agreement creates an objective standard for dismissing probationary employees: the unsatisfactory completion of the probationary period with reference to the uniform Rater's Guide standards.[21] Under Section 18.17(D), the State has the responsibility "to provide the uniformity of the application of standards by different rating officers by providing training and a 'Rater's Guide' to supervisors who have the responsibility of evaluating" employees. These factors indicate that the State may not terminate probationary employees on a whim under the State–APEA collective bargaining agreement; termination must be based on a failure to meet objective standards either set forth in employee regulations or "that a reasonable person would use in evaluating an employee's performance."[22]

■■■ In sum, after analyzing the State–APEA agreement in light of *Tovsen*, we conclude that, as a matter of contract interpretation, the superior court did not err in rejecting the State's argument on cross-appeal that it could terminate Cassel, as a probationary employee, merely because of a supervisor's personal dissatisfaction with his performance without regard to objective standards.[23]

### C. Objective Grounds Support Cassel's Termination.

■■■ In his appeal, Cassel argues that the Department of Administration failed to comply with Judge Souter's remand order and to apply an objective standard as required by *Tovsen*.[24]

■■■■ In *Braun v. Alaska Commercial Fishing & Agriculture Bank*,[25] we enunciated the court's proper role in assessing terminations for cause.[26] A court reviews such a termination to ensure that it "is not for any arbitrary, capricious, or illegal reason and ... is ... based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true."[27] This approach thus "checks the subjective good faith of the employer with an objective reasonable belief standard."[28] As in *Tovsen*, this court will uphold a good faith termination upon substantial evidence of "an objective failure to meet acceptable standards," in other words, "when objective standards of performance are not satisfied."[29]

Hearing Officer Schmidt correctly set forth and applied the objective standard requirements of *Tovsen* and *Braun*. First, Schmidt properly concluded that unsatisfac-

---

**21.** *See Tovsen*, 835 P.2d at 447, 447 n. 2 (discussing agreement that permits termination only for failure to satisfy objective standards of performance, i.e., standards with reference to "external sources such as employee rules and regulations or standards that a reasonable person would use in evaluating an employee's performance"); *see also Stanfill v. City of Fairbanks*, 659 P.2d 579, 583 (Alaska 1983) (requiring just cause for termination of probationary employee where city personnel ordinance provided performance-related grounds for dismissal, namely "inability or unwillingness to perform the job or unsuitability for the position").

**22.** *Tovsen*, 835 P.2d at 447 n. 2. Given the agreement's framework of performance evaluations based on objective standards, the fact that § 18.12 explicitly ties the retention of probationary employees to "the judgment of the Employer" does not by itself create a satisfaction contract.

**23.** We note that, while this particular contract requires a failure of objective standards to warrant termination of probationary employees, just cause is not per se required for the termination of probationary employees. We do not hold that the State is precluded from negotiating a satisfaction contract with APEA or other labor unions in order to establish an at-will employment relationship with probationary employees.

**24.** *See* 835 P.2d at 446–47.

**25.** 816 P.2d 140 (Alaska 1991).

**26.** *See Manning v. Alaska R.R. Corp.*, 853 P.2d 1120, 1125 n. 2 (Alaska 1993) (citing *Braun*, 816 P.2d at 142).

**27.** *Braun*, 816 P.2d at 142 (quoting *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wash.2d 127, 769 P.2d 298, 304 (1989)).

**28.** *Baldwin*, 769 P.2d at 304.

**29.** 835 P.2d at 447.

tory performance of duties constituted just cause for termination. This conclusion clearly comports with the State–APEA agreement, which defines "just cause" as "incompetence, *unsatisfactory performance of duties,* unexcused absenteeism, intoxication, substance abuse, dishonesty and gross disobedience." (Emphasis added.)

 Second, Hearing Officer Schmidt properly applied an objective standard. Cassel claims that Schmidt erred by relying on the subjective evaluations of Cassel's supervisor rather than substituting her own evaluation of Cassel's performance in light of objective standards. But a supervisor's performance evaluation invariably involves that supervisor's personal assessment of the employee's performance. The hearing officer's duty under *Braun* and *Tovsen* is to ensure that the supervisor's evaluations were made in good faith and in reference to objective performance standards. Therefore, Schmidt did not err in concluding that satisfactory performance was to be judged by the supervisor or in relying heavily on Bischoff's evaluation of Cassel.

Bischoff described a number of shortcomings that were cited by Schmidt: (1) Cassel's draft capital budget "needed major work" and had to be completed by a different employee; (2) Cassel did not interact on a routine basis with other key team members; (3) Cassel required direction and did not adequately act in an independent and proactive manner; (4) Cassel did not focus on his primary mission of fingerprint processing but rather emphasized the cultivation of alliances with coordinate law enforcement divisions; (5) Cassel would have missed a deadline for submitting a document had another employee not completed the written product; (6) Cassel mishandled an alleged sexual harassment incident and an equipment fire; (7) Cassel did not pay enough personal attention and inappropriately delegated responsibility with respect to the automation of work flow processes; (8) Cassel's management resulted in a large backlog of requests and numerous complaints; and (9) Cassel's monthly reports failed to provide the expected management analysis.

Co-worker Kathy Mather corroborated Bischoff's assessments regarding Cassel's contribution to the backlog and his poor management abilities. Another co-worker, John McGhee, testified that Cassel had improperly conducted employment interviews, gave out incorrect information to the public, contributed to the work backlog, and improperly accessed a law enforcement information system (ASPIN) for personal use.

In light of this evidence, we concur with Judge Murphy that substantial evidence supported the hearing officer's decision. The cited criticisms of Cassel touch on several aspects of managerial performance: supervision, delegation, communication, execution, analysis, judgment, and prioritization. These are precisely the areas that a reasonable person would examine in evaluating a supervisory employee's performance.

Because Hearing Officer Schmidt relied on evidence of Cassel's failure to meet objective managerial performance standards, we conclude that the superior court was correct in affirming her decision.

### D. *The Superior Court Did Not Err in Denying Cassel Back Pay.*

 Following Judge Souter's order remanding the case for an objective good cause determination, Cassel moved to clarify the remedy. In particular, Cassel sought back pay for the State's failure to provide an adequate due process hearing. After hearing arguments, Judge Souter denied Cassel's motion, concluding that Cassel had received due process through the post-termination meeting convened under the complaint procedures of the collective bargaining agreement. Cassel claims that this decision was erroneous because the Doyle meeting was not an adequate adversarial hearing.[30]

---

**30.** Cassell further claims that his due process rights were violated because the Doyle meeting did not apply the "just cause" standard. But Cassel has cited no legal authority for this proposition. We therefore reject this argument. *See*

*Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) ("where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal").

In *Storrs v. Municipality of Anchorage*,[31] we determined that public employees terminable only for cause under a collective bargaining agreement "have a sufficient property interest in continued employment to warrant due process protection prior to termination."[32] This due process protection arises from both the federal and Alaska constitutions.[33] Furthermore, "[w]hen a constitutionally unlawful dismissal is cured by a post-termination hearing, the employee is entitled to be paid for the period between dismissal and the curative hearing."[34]

Ordinarily, the public employee is entitled to an adversarial hearing *before* termination.[35] However, in limited circumstances, a post-termination adversarial hearing may satisfy the due process requirements "when a collective bargaining agreement waives the constitutionally mandated pretermination adversarial hearing ... [and] provides fair, reasonable, and efficacious procedures by which employer-employee disputes may be resolved."[36] Although a full evidentiary hearing is not required, the procedures must provide an opportunity for the employee "to present a defense by testimonial and other evidence."[37] When the collective bargaining agreement provides such procedures, the employee suffers no due process violation through the use of a post-termination hearing and thus is not entitled to back pay.[38]

Because Cassel received no pretermination hearing, the central dispute is whether the State–APEA agreement provides for a post-termination adversarial hearing that is fair, reasonable, and efficacious. In contrast to the heightened grievance procedures available to permanent employees under Section 10.2, probationary employees may appeal their dismissals solely through the complaint procedure provided in Section 10.1. Under the complaint procedure of Section 10.1(5)(c), APEA may present the appeal of a probationary employee's dismissal to the Commissioner of Administration. Upon request, "a meeting between the [APEA] Representative and the Commissioner or a designee will be convened to discuss the complaint." The Commissioner is then required to issue a decision within twenty days of that meeting.

Here, after Cassel appealed to the Commissioner of Administration, he met with State labor analyst Mila Doyle to discuss his complaint. APEA official Dennis Geary represented Cassel at the meeting and provided documentary evidence to Doyle. Although the participants did not take oaths or engage in cross-examination, Cassel had the opportunity to present his position to Doyle and call a witness, Lieutenant Jay Yakopatz, to provide further information. One month later, Doyle submitted a short memorandum entitled "Complaint Synopsis" to Commissioner Boyer, analyzing the parties' positions and

---

31. 721 P.2d 1146 (Alaska 1986).

32. *Id.* at 1148. *Cf. Chijide v. Maniilaq Ass'n of Kotzebue, Alaska*, 972 P.2d 167, 171–72 (Alaska 1999) (finding no property interest in continued employment where employee could be fired at any time without cause and worked under year-to-year contract that could be renewed or not renewed for any reason); *Breeden v. City of Nome*, 628 P.2d 924, 926 (Alaska 1981) ("A person who is employed 'at the pleasure' of his employer has no 'property' interest in continued employment that is protected by due process.").

33. *See Storrs*, 721 P.2d at 1148, 1150.

34. *Id.* at 1151.

35. *See id.* at 1150.

36. *Id.* (citations and quotations omitted); *see also Chaney v. Suburban Bus Div. of Regional Transp. Auth.*, 52 F.3d 623, 628–630 (7th Cir.1995); *Wallace v. Tilley*, 41 F.3d 296, 301–02 (7th Cir.1994);

*Buttitta v. City of Chicago*, 9 F.3d 1198, 1206 (7th Cir.1993).

37. *Storrs*, 721 P.2d at 1150; *see also City of North Pole v. Zabek*, 934 P.2d 1292, 1298 (Alaska 1997) (concluding that terminated employee received due process because of adversarial proceeding and representation by counsel, and her ability to frame issues and submit witness affidavits); *North Slope Borough v. Barraza*, 906 P.2d 1377, 1383–84 (Alaska 1995) (Matthews, J., concurring) (stating that *Storrs* properly articulated requirements for pre-termination hearing); *Nichols v. Eckert*, 504 P.2d 1359, 1365 (Alaska 1973) ("A full judicial hearing is not necessary, but a hearing that allows the administrative authority to examine both sides of the controversy will protect the interests and rights of all who are involved.").

38. *See Storrs*, 721 P.2d at 1151 (noting that back pay is only available for "constitutionally unlawful" dismissal).

offering recommendations. Commissioner Boyer then denied Cassel's complaint.

We conclude that these procedures represent a "fair, reasonable, and efficacious" means of dispute resolution. The post-termination procedures accepted by APEA and provided to Cassel by the State do not constitute a due process violation. Because Cassel received "fair, reasonable, and efficacious" post-termination procedures in accordance with the collective bargaining agreement, Cassel received due process and is therefore not entitled to back pay.

## IV. *CONCLUSION*

For the foregoing reasons, we AFFIRM Cassel's termination and the denial of back pay.