G. Mark JURGENS, Appellant,

v.

CITY OF NORTH POLE, a Home–Rule Municipality, and its Personnel Review Board, Appellee.

No. S–11847.

Supreme Court of Alaska.

March 2, 2007.

---

James M. Hackett, Law Office of James M. Hackett, Fairbanks, for Appellant.

Zane D. Wilson, Cook Schuhmann & Groseclose, Inc., Fairbanks, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

The City of North Pole terminated Sergeant Mark Jurgens from the North Pole Police Department after a pre-termination review board concluded that he had engaged in conduct amounting to hostile work environment sexual harassment.[1] Jurgens appealed and the superior court affirmed. We now conclude that substantial evidence supports the board's decision. For that and other related reasons, we affirm.

---

1. Black's Law Dictionary defines hostile-environment sexual harassment as "[s]exual harassment in which a work environment is created where an employee is subject to unwelcome verbal or

## II. FACTS AND PROCEEDINGS

This appeal arises from personnel proceedings initiated by the City of North Pole against Sergeant Mark Jurgens. The proceedings culminated in a hearing before a city pre-termination review board and a decision by the board to terminate Sergeant Jurgens. Sergeant Jurgens worked for the North Pole Police Department as a police officer between February 1999 and January 2000 and as a patrol sergeant with supervisory authority over officers and dispatchers between January 2000 and July 2003. In June 2003 Tammy Searles–Streeter (Streeter), a dispatcher in the department, complained to department Chief Lonnie Hatman that Jurgens had acted inappropriately towards her and other dispatch personnel. Streeter alleged numerous inappropriate actions, which Chief Hatman summarized by saying that between November 2002 and June 2003, Jurgens had "subjected employee(s) of the department to sexual harassment by making unwelcome sexual advances and suggestive and explicit verbalizations of a sexual nature" and that Jurgens's conduct "had the effect of unreasonably interfering with [Streeter's] work performance, and created an intimidating, hostile, and offensive work environment."

The department conducted an internal investigation regarding Streeter's allegations. After interviewing department personnel, including Jurgens, the department concluded that Jurgens's conduct amounted to "sexual harassment" and that his conduct had created "an intimidating, hostile, and offensive work environment." In addition, the department made the following written findings:

> Sgt. Jurgens [ ] has made several phone calls to dispatchers, both while sober and while under the influence, while they were working and at home. He has stopped them with his patrol unit unofficially and without cause for non work related reasons. He has verbally compared dispatchers breasts and body parts during those phone calls and he told one dispatcher that

---

physical sexual behavior that is either severe or pervasive." BLACK'S LAW DICTIONARY 1407 (8th ed.2004).

he wanted to have sex with her and described how he wanted to do so. He has intentionally subjected them to offensive conduct while they were working. Despite one apology to one dispatcher acknowledging that his words were inappropriate he continued to make suggestive and explicit remarks of a sexual nature to female employees. He has spoken and taken actions with more than one dispatcher that have impaired their ability to work effectively with him and that has created an atmosphere of fear and intimidation among them so that they are afraid to say anything about his actions for fear of retaliation and the loss of their jobs. Although a certain level of joking and innuendo are not uncommon among employees[,] Sgt. Jurgens'[s] words and actions in this regard are a gross deviation from the standard of conduct a reasonable person in his position would believe to be acceptable. Sgt. Jurgens admits that his actions in this regard were inappropriate.

Based on these findings, on the city's "zero tolerance policy" for sexual harassment, and on the fact that Jurgens had received sexual harassment training, the department decided to terminate Jurgens. The department notified Jurgens of his right to appeal and suspended him without pay until his termination became effective.

Jurgens requested a pre-termination hearing. On July 28–29, 2003 a three-member review board and a hearing officer held a hearing at which the city and Jurgens, both represented by counsel, presented evidence and were allowed to examine and cross-examine witnesses. In a memorandum decision issued July 30, 2003 the board unanimously concluded that the department had just cause to terminate Jurgens. The board made no findings, except to conclude that Jurgens had "engaged in conduct clearly amounting to sexual harassment and that

such conduct affected the complainant's work performance and also created an intimidating, hostile and offensive work environment." The board also concluded that Jurgens's conduct was "a serious offense justifying dismissal." The board affirmed Jurgens's dismissal.

Jurgens appealed to the superior court and argued that: the board's conclusion was not supported by substantial evidence; the board should have used a clear and convincing evidence standard of proof; the board incorrectly found that just cause existed for Jurgens's dismissal; and the board erred by not imposing a lesser discipline than dismissal. The superior court, in a written memorandum opinion and judgment, rejected all of Jurgens's arguments and affirmed the board's decision.

Jurgens petitioned the superior court for rehearing. The superior court denied that petition.

On appeal to this court, Jurgens argues that the board's findings and conclusions are insufficient to permit meaningful appellate review and renews the arguments he made in the superior court.

## III. DISCUSSION

### A. Standard of Review

■ When the superior court acts as an intermediate court of appeals, as it did here, we independently review the administrative decision.[2] We will uphold the board's decision if it is supported by substantial evidence.[3] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] In reviewing the board's decision we do not weigh evidence, determine witness credibility, or evaluate competing inferences from testimony.[5] We review questions of law, in-

---

2. *Circle De Lumber Co. v. Humphrey*, 130 P.3d 941, 946 (Alaska 2006); *Faulk v. Bd. of Equalization*, 934 P.2d 750, 751 n. 2 (Alaska 1997).

3. *Lindhag v. State, Dep't of Natural Res.*, 123 P.3d 948, 952 (Alaska 2005); *Fields v. Kodiak City Council*, 628 P.2d 927, 932 (Alaska 1981) ("The duty of this court, and that of the superior court

below, is to determine whether [substantial] evidence supports the board's conclusions.").

4. *Municipality of Anchorage v. Devon*, 124 P.3d 424, 428–29 (Alaska 2005) (quoting *Cowen v. Wal–Mart*, 93 P.3d 420, 424 (Alaska 2004)).

5. *Id.* at 429; *Lindhag*, 123 P.3d at 952.

cluding the appropriate standard of proof, using our independent judgment.[6]

## B. Jurgens Failed To Preserve the Argument that the Board's Findings and Conclusions Are Insufficient To Permit Meaningful Appellate Review.

■ Jurgens argues that the board's findings and conclusions are insufficient to permit meaningful appellate review. He argues that the board failed to address material disputes, including whether his conduct was unwelcome and whether it was sufficiently pervasive to be considered hostile work environment sexual harassment. He points out that the board did not discuss whether he could have been rehabilitated and did not address any of the testimony presented at the hearing, including testimony favorable to him. And Jurgens notes that, although some of the testimony regarding sexual harassment conduct was contested, the board never specified which episodes of conduct it believed occurred or which amounted to sexual harassment conduct under North Pole Municipal Code (NPMC) 2.36.291.

■ These arguments are unavailing here because Jurgens did not raise them below. Although Jurgens listed the sufficiency of the findings as an issue in his points on appeal to the superior court, he did not mention this issue in his superior court briefs. An issue is considered abandoned in an administrative appeal to the superior court if the appellant inadequately briefs the issue.[7]

Jurgens does not challenge North Pole's assertion that he failed to argue this issue below; instead, he argues that his failure in the superior court to brief the issue is not fatal because "the inadequacy of the [b]oard's findings is manifest." He correctly notes that in two cases—*Manthey v. Collier*[8] and *Hewing v. Alaska Workmen's Compensation Board*[9]—we considered the adequacy of the workers' compensation board's findings even though the appellants had not properly raised the issue. In *Manthey,* we stated that we would consider the inadequacy of the board's findings, even though the issue had not been argued to the superior court, because we "can ... consider manifest error appearing on the face of the record."[10] In *Hewing,* we considered whether the board's findings were adequate, even though the appellant had not argued the issue on appeal to us, because, as we explained, "the error [was] manifest on the face of the record."[11] We have only used this specific reason for considering an unpreserved issue in one other case—*White v. Alaska Commercial Fisheries Entry Commission.*[12] We there considered whether the superior court committed reversible error by not remanding a Commercial Fisheries Entry Commission decision for entry of adequate findings, even though the appellant had not argued the issue, because "the deficiency [was] manifest on the record before us."[13]

In *Manthey* and *Hewing* we held that the inadequacy of the workers' compensation board's findings of fact was a "manifest error" because the Alaska Administrative Procedure Act required such findings.[14] In *White* we held that "although [a findings] requirement ha[d] not been imposed categorically in cases involving applications for limited entry permits, compliance with [the Administrative Procedure Act] is practically impossible absent some indication of the basis of the [agency's] action."[15] In all three cases, the agency had made an obvious mistake that the superior court should have

6. *See Romulus v. Anchorage Sch. Dist.,* 910 P.2d 610, 615 n. 3, 618–19 (Alaska 1996).

7. *Nenana City Sch. Dist. v. Coghill,* 898 P.2d 929, 934 (Alaska 1995).

8. *Manthey v. Collier,* 367 P.2d 884 (Alaska 1962).

9. *Hewing v. Alaska Workmen's Comp. Bd.,* 512 P.2d 896 (Alaska 1973).

10. *Manthey,* 367 P.2d at 889.

11. *Hewing,* 512 P.2d at 898 n. 4.

12. *White v. Alaska Commercial Fisheries Entry Comm'n,* 678 P.2d 1319 (Alaska 1984).

13. *Id.* at 1322.

14. *Hewing,* 512 P.2d at 898; *Manthey,* 367 P.2d at 889.

15. *White,* 678 P.2d at 1322 n. 9.

noticed in trying to review the agency decision.[16]

The pre-termination review board did not make any such obvious mistake here. The North Pole ordinance governing the board does not require the board to make specific findings.[17] And as we explained in *Faulk v. Board of Equalization*, the question whether an agency's findings are sufficient to enable meaningful judicial review is a functional one: "do the agency's findings facilitate this court's review, assist the parties and restrain the agency within proper bounds?"[18] The board's findings here met that standard. The limited findings made it clear that the board was rejecting Jurgens's version of the facts.[19] And even though the board's findings were relatively conclusory, they were consistent with Chief Hatman's more extensive findings and affirmed his termination decision. We can safely assume that the board accepted Chief Hatman's factual findings.

■ Because no clear mandate required the board to make any findings, and because the absence of more elaborate findings does not prevent meaningful review, the superior court did not commit reversible error by failing to remand for additional findings.

16. The "manifest error" standard is therefore similar to our "plain error" standard under which we will only review claims not raised below "where an obvious mistake has been made which creates a high likelihood that injustice has resulted." *See Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 227–28 (Alaska 2005) (quoting *D.J. v. P.C.*, 36 P.3d 663, 667–68 (Alaska 2001) (quoting *Broeckel v. State, Dep't of Corr.*, 941 P.2d 893, 897 (Alaska 1997))); *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981).

17. *See* North Pole Municipal Code (NPMC) 2.36.321.

18. *Faulk v. Bd. of Equalization*, 934 P.2d 750, 751 (Alaska 1997) (quoting *South Anchorage Concerned Coal., Inc. v. Coffey*, 862 P.2d 168, 175 (Alaska 1993)); *see also Alvarez v. Ketchikan Gateway Borough*, 28 P.3d 935, 940–41 & nn. 18–19 (Alaska 2001) (reviewing sufficiency of findings cases). By comparison, we observed in *White* that the "CFEC itself noted ... 'one cannot tell whether the Commission ruled adversely to White on the factual issue, or whether its ruling was on legal grounds.' " *White*, 678 P.2d at 1322. "It is impossible to ascertain whether

## C. The Board's Findings Are Supported by Substantial Evidence.

Jurgens argues that the board's findings are not supported by substantial evidence. He specifically argues that the totality of the circumstances do not clearly establish that Jurgens's conduct was unwelcome and offensive to Streeter or that Jurgens's conduct affected Streeter's work performance.[20]

Under the North Pole Municipal Code, sexual harassment is defined both by the actual conduct and that conduct's effect:

> [U]nwelcome sexual advances; requests for sexual favors; sexual demands; or other verbal, physical or visual conduct of a sexual nature will constitute sexual harassment when:
>
> . . . .
>
> The conduct has the purpose or effect of unreasonably interfering with an affected person's work performance, or creating an intimidating, hostile or offensive work environment. [21]

The board found that Jurgens "engaged in conduct clearly amounting to sexual harassment" and found that such conduct "affected the complainant's work performance" and "created an intimidating, hostile and offensive work environment."

the CFEC rejected White's claim that he was not involved in the day-to-day operation of the plumbing business or whether it concluded as a matter of law that income from a sole proprietorship should necessarily be deemed 'nonfishing occupational income' " within the meaning of the regulation. *Id.* (footnote omitted).

19. The board stated in its decision that Jurgens had "engaged in conduct clearly amounting to sexual harassment and that such conduct affected the complainant's work performance and also created an intimidating, hostile and offensive work environment." The board also stated that Jurgens's conduct was "a serious offense justifying dismissal."

20. Jurgens more generally argues that the board erroneously applied the code as a "general civility code," which we interpret as an argument that Jurgens's conduct was not severe, unwelcome, or offensive enough to be hostile work environment sexual harassment. But Jurgens does not argue that the evidence does not support the board's findings about his specific conduct.

21. NPMC 2.36.291(A).

The evidence presented to the board supports a finding that Jurgens's conduct was unwelcome and offensive to Streeter.[22]

For example, Jurgens admitted that, while at work, he held a plastic pacifier shaped like a penis near Streeter's face and took a photograph. Streeter testified about how this incident made her feel:

Initially, shocked. Kind of put in my place and belittled as being a female with other men in the room. I didn't want to react so that, you know, they couldn't make fun of that. However, you know, it made you feel like, you know, you were like this big.

Streeter testified that Jurgens refused to give her the disk with the photograph on it and discussed putting the photograph on the department website or emailing it to her husband. She testified that she felt "cornered" and that she "didn't find it . . . very funny."

Streeter testified that when Jurgens was off-duty and intoxicated, he called Streeter at work and made remarks about her body. She testified that Jurgens compared her breasts with those of another dispatcher. Another officer at the department overheard Jurgens make this comment to Streeter, and Jurgens did not deny making this remark. Jurgens testified that he could not remember the incident but admitted he might have made such a statement while intoxicated. Streeter also testified that during the same telephone conversation, Jurgens asked her to come over to his house and told her in graphic terms that he wanted to have sexual intercourse with her.[23] Streeter explained that she tried to get off the phone with Jurgens:

I was trying to be passive without upsetting him, because when he does come back to work I have to work with him, but I was telling him that, Mark, you know, you've got to go to sleep, you've got to get up in the morning, you know, I've got to go, I've got to get off the phone. You know, Mark, you've been drinking, you really just need to sleep this off.

Streeter testified that this telephone conversation and other incidents made her feel "[v]ery uncomfortable at work, not wanting to come into work not wanting to make [Jurgens] mad, [and] not actually safe."

Streeter and other dispatchers submitted written statements recounting how Jurgens had on numerous occasions tried to throw small objects down their shirts. Streeter also stated in her written statement, and Jurgens admitted, that Jurgens had wiped his hand on the nozzle of a pepper spray bottle and then wiped his finger on either side of her neck. And Streeter testified that on one occasion, Jurgens raised his hand at her and told her to "shut the f— up."

Terry Nelson, another police department dispatcher, testified that while she was working, Jurgens called her and told her that he was lying in bed thinking about her. Nelson testified that she was "shocked" by that statement. When specifically asked if he denied making this statement, Jurgens responded that he did not dispute making the statement.

■ This evidence is substantial and it supports a finding that Streeter and other dispatchers found Jurgens's conduct unwelcome and offensive and that their perspective was reasonable. Although Jurgens argues that we should consider evidence that suggests Streeter flirted with Jurgens and engaged in sexualized behavior at the office, our task on appellate review does not include weighing evidence, determining witness credibility, or evaluating competing inferences from testimony "because those functions are reserved to the [b]oard."[24] As we explained in *Lindhag v. State, Department of Natural Resources,* "even when conflicting evidence exists, we uphold the [b]oard's decision if

---

22. North Pole does not contest Jurgens's assertion that conduct constitutes sexual harassment only if it is unwelcome. We therefore do not need to decide whether Jurgens's assertion is correct; we assume for the purposes of this appeal that the code requires a finding of unwelcomeness, regardless of the type of conduct in which Jurgens engaged.

23. Jurgens denied making such a statement, although he admitted that because of his drinking that night he could not remember exactly what he had said to Streeter.

24. *Lindhag,* 123 P.3d at 952 (quoting *Robinson v. Municipality of Anchorage,* 69 P.3d 489, 493 (Alaska 2003)).

substantial evidence supports it." [25] Given Streeter's testimony that she felt belittled, uncomfortable, and unsafe, and given the evidence of Jurgens's sexual advances and other conduct of a sexual nature, the board did not err when it found that Jurgens's conduct was unwelcome and that it amounted to hostile work environment sexual harassment.

We also reject Jurgens's more general argument that the board applied the municipal code as a "general civility code." Jurgens suggests that his conduct was just "[s]imple teasing, off-hand comments, and isolated incidents." But Jurgens admitted that two of the individual incidents occurred: he admitted that he shoved the penis pacifier in Streeter's face and photographed it and that he wiped his finger on the pepper spray bottle and then on Streeter's neck. And Jurgens did not deny that he told dispatcher Nelson that he was in bed thinking about her or that he compared Streeter's breasts to another dispatcher's. The uncontroverted evidence alone therefore supports a finding that Jurgens's conduct went beyond simple teasing; it was serious, pervasive, and unwelcome.

The evidence also supports the board's finding that Jurgens's conduct "affected the complainant's work performance." Streeter testified that Jurgens's conduct made her feel "[v]ery uncomfortable at work, not wanting to come into work, not wanting to make [Jurgens] mad, [and] not actually safe." Streeter testified that her "safety net" had been taken away, that she could not count on Jurgens as a team member, and that Jurgens intimidated her. Streeter testified that she was "scared" to come forward with allegations against Jurgens because she was afraid he would retaliate against her and make her job more difficult. Others in the department also testified that they feared retaliation from Jurgens. Given Streeter's testimony that she felt unsafe and uncomfortable at work and that she did not want to go to work, the board did not clearly err when it found that Jurgens's conduct affected Streeter's work performance.

## D. The Board Applied the Appropriate Standard of Proof.

Jurgens argues that the board should have been required to make its findings using a clear and convincing evidence standard instead of a preponderance of the evidence standard. North Pole argues that Jurgens waived this argument, and that the preponderance of the evidence standard is appropriate here.

### 1. Jurgens properly preserved this issue for appeal.

■ Jurgens preserved his argument regarding the appropriate standard of proof. During Jurgens's closing argument to the board, he argued that "in a serious case like this of termination the standard of proof should be more than just by the greater weight or majority of the evidence." The city interrupted, and objected that Jurgens's argument was an "improper statement of the law." Jurgens also submitted to the board an excerpt from a book entitled *The Rights of Law Enforcement Officers,* in which the author states that some courts and arbitrators have applied a clear and convincing evidence standard in police officer termination cases. And Jurgens argued the point in his opening brief to the superior court. Jurgens therefore preserved this issue for appeal by arguing it to the board and the superior court.[26]

### 2. The preponderance of the evidence standard applies here.

We have previously decided that the preponderance of the evidence standard of proof applies to public employee termination proceedings.[27] In *Romulus v. Anchorage School*

**25.** *Lindhag v. State, Dep't of Natural Res.,* 123 P.3d 948, 952 (Alaska 2005) (quoting *Bradbury v. Chugach Elec. Ass'n,* 71 P.3d 901, 905 (Alaska 2003)).

**26.** *Cf. Wagner v. Stuckagain Heights,* 926 P.2d 456, 459 (Alaska 1996) (holding that appellant waived argument by failing to raise argument before workers' compensation board and failing to list or brief issue in administrative appeal to superior court).

**27.** *See Romulus v. Anchorage Sch. Dist.,* 910 P.2d 610, 619 (Alaska 1996).

*District,* we considered whether the Anchorage School Board erred when, in the context of a disciplinary proceeding, it used a preponderance of the evidence standard to decide whether Romulus, an ROTC instructor, sexually abused two high school students.[28] We held that the board had not erred and that "the preponderance of evidence standard applies to disciplinary proceedings involving a government employee."[29] In so deciding, we relied on case law from other jurisdictions in which courts had held that the preponderance of the evidence standard was the correct standard to use in termination proceedings for teachers, police officers, and hospital workers.[30]

Jurgens argues that *Romulus* is distinguishable because unlike Romulus, Jurgens will lose his police certificate and his livelihood. Jurgens also argues that the cases involving police officers relied upon by *Romulus* are distinguishable.

Jurgens's arguments are without merit. Like Jurgens's case, *Romulus* involved serious allegations of misconduct against a public employee.[31] Like Jurgens, Romulus was terminated.[32] Moreover, although Romulus technically may have been able to pursue another teaching position, it is unlikely that any school would have hired him after he was fired for sexually abusing two female students. Thus, like Jurgens, Romulus faced loss of his ability to continue his chosen profession.

Jurgens also argues that some of the cases we relied upon in *Romulus* are distinguishable from his case. In *Romulus,* we relied in part on *Clark v. Board of Fire & Police Commissioners of Bradley,* in which the Illinois Court of Appeals held that a preponder-

ance of the evidence standard adequately protected a police officer's professional interests in a termination proceeding, in part because the discharged police officer was not barred from obtaining employment with another police force.[33] We also relied on *Meyers v. Montgomery County Police Department.*[34] In that case, the Maryland Court of Special Appeals approved the use of a preponderance of the evidence standard, in part because the reprimanded officer had not shown that he possessed a protected property right in his continued employment.[35] Jurgens is correct that those cases are not factually identical to his, but that does not mean that *Romulus* itself is distinguishable. And Jurgens does not persuade us that *Romulus* should somehow be limited or narrowed to the facts in *Clark* or *Meyers.* Jurgens's argument regarding *Clark* is of limited value because, as mentioned, *Romulus* itself involved a situation in which the terminated employee would have great difficulty obtaining another teaching position. And Jurgens's argument regarding *Meyers* is not persuasive because in a subsequent case, the Maryland Court of Appeals expanded the *Meyers* holding.[36] In *Coleman v. Anne Arundel County Police Department,* the high court of Maryland held that the preponderance of the evidence standard was the correct evidentiary standard for law enforcement disciplinary proceedings, even assuming the terminated employee had a protected property or liberty interest in his continued employment.[37]

*Coleman* is instructive here. In that case, the Maryland Court of Appeals considered whether an administrative hearing board was

28. *Romulus v. Anchorage Sch. Dist.,* 910 P.2d 610, 618 (Alaska 1996).

29. *Id.* at 619.

30. *Id.* at 618–19.

31. *See id.* at 612–13.

32. *See id.* at 614.

33. *See Clark v. Bd. of Fire & Police Comm'rs of Bradley,* 245 Ill.App.3d 385, 184 Ill.Dec. 509, 613 N.E.2d 826, 830 (1993), *cited in Romulus,* 910 P.2d at 618.

34. *Meyers v. Montgomery County Police Dep't,* 96 Md.App. 668, 626 A.2d 1010, 1026 (1993), *cited in Romulus,* 910 P.2d at 618.

35. *Id.* at 1026.

36. *See Coleman v. Anne Arundel County Police Dep't,* 369 Md. 108, 797 A.2d 770, 784–87 (2002).

37. *Coleman v. Anne Arundel County Police Dep't,* 369 Md. 108, 797 A.2d 770, 789 (2002).

required to apply a clear and convincing evidence standard of proof to theft-related charges against a police officer. In a lengthy analysis, the court first considered whether Maryland case law required the heightened standard.[38] The court overruled an earlier case in which it had, on common law grounds, required the Maryland Public Service Commission to use a clear and convincing evidence standard when adjudicating charges of fraud against a customer.[39] The *Coleman* court explained that the preponderance of the evidence standard was the appropriate disciplinary proceeding standard for law enforcement officers, even when allegations of criminal misconduct were made, because "[t]his standard makes for more efficient and understandable [police disciplinary] proceedings" and provides for "uniformity in law enforcement disciplinary matters."[40]

The *Coleman* court then considered Coleman's argument that applying a preponderance of the evidence standard was unconstitutional under the due process clauses of the federal and Maryland constitutions.[41] Applying the three-part *Mathews v. Eldridge* test,[42] the court assumed that the terminated officer had demonstrated a cognizable property or liberty interest in his continued employment, but held that the government had at least as strong an interest in the internal discipline of the police department.[43] The court noted that the officer was afforded a "panoply" of procedural rights including notice, a hearing, the right to present evidence and argument, and the right to cross-examine witnesses.[44] And the court noted that a higher evidentiary standard would not likely reduce the risk of erroneous fact-finding:

"Candor requires that we acknowledge the difficulty a lay panel may encounter in perceiving the subtle distinctions and nuances between these two abstract standards when called upon to apply it."[45] The court concluded that the preponderance of the evidence standard "strikes the appropriate balance between protecting the private interests of an officer accused of misconduct and a law enforcement agency's interest in maintaining internal discipline."[46]

 We agree with the *Coleman* court and hold that using the preponderance of the evidence standard in public employee disciplinary proceedings satisfies the due process clauses of the Fourteenth Amendment and article I, section 7 of the Alaska Constitution. We too have adopted the *Mathews v. Eldridge* three-part balancing test to determine whether administrative proceedings satisfy due process.[47] This test takes into account the following:

[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the [probable] value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [48]

 Applying the *Mathews v. Eldridge* test here, we agree with Jurgens that, because he can only be terminated for "just

---

**38.** *Id.* at 779–90.

**39.** *Id.* at 790 (overruling *Everett v. Balt. Gas & Elec. Co.*, 307 Md. 286, 513 A.2d 882, 889–91 (1986)).

**40.** *Id.* at 789.

**41.** *Id.* at 790.

**42.** *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**43.** *Coleman*, 797 A.2d at 795.

**44.** *Id.* at 793–94.

**45.** *Id.* at 794.

**46.** *Id.* at 795.

**47.** *Brandal v. State, Commercial Fisheries Entry Comm'n*, 128 P.3d 732, 738 (Alaska 2006).

**48.** *Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *Brandal*, 128 P.3d at 738 (quoting *State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n, Inc.*, 116 P.3d 580, 583 (Alaska 2005)). *Brandal* and *Valley Hospital Ass'n* inadvertently misquote *Mathews v. Eldridge*, substituting the word "probative" for "probable." *See Brandal*, 128 P.3d at 738; *Valley Hosp. Ass'n*, 116 P.3d at 583.

cause,"[49] he has a protected property interest in his employment.[50] But we do not agree that he has a protected liberty interest based on the stigmatizing effect of a dismissal for sexual harassment. As we explained in *DeNuptiis v. Unocal Corp.*, "a worker's reputational interest is not so fundamental that it must be protected by a heightened standard."[51] That said, the potential stigmatizing effect of a dismissal for sexual harassment and the fact that the dismissal will preclude Jurgens from obtaining other law enforcement positions in Alaska, and probably other states as well, strengthens Jurgens's interest.

The government also has a strong interest in cases of police disciplinary proceedings. As Jurgens concedes, North Pole has an interest in eliminating sexual harassment from the workplace and in disciplining employees who engage in sexual harassment.[52] And as North Pole argues, it also has an interest in protecting the public at large from employees who engage in sexual misconduct. Although we assume here that North Pole would not incur any greater fiscal or administrative burdens if required to apply a heightened standard, we agree with the *Coleman* court that we must "weigh heavily in [North Pole's favor North Pole's] interest in the internal discipline of the police department."[53]

In terms of the second *Mathews* factor, Jurgens suggests that North Pole should have analyzed or considered the value of a clear and convincing evidence standard. But Jurgens does not explain how he is at risk of an erroneous deprivation of his private interests or how a clear and convincing standard would limit that risk. We assume that a higher standard of proof would reduce the risk of wrongful discipline.[54] But due process does not require a higher standard here. Although Jurgens has a strong interest in his position as a police officer, the government has an equally strong interest in eliminating sexual harassment from the workplace and in protecting the public from officers who violate the law. The preponderance of the evidence standard is the appropriate standard when the possible harm to each party is roughly equal.[55]

We conclude that under *Romulus*, the board did not err when it applied the preponderance of the evidence standard of proof. And like the *Coleman* court, we con-

---

**49.** *See* NPMC 2.36.310(A), .321(F)(4).

**50.** *See Cassel v. State, Dep't of Admin.*, 14 P.3d 278, 286 (Alaska 2000) (noting that public employees terminable only for cause under collective bargaining agreement "have a sufficient property interest in continued employment to warrant due process protection prior to termination" (quoting *Storrs v. Municipality of Anchorage*, 721 P.2d 1146, 1148 (Alaska 1986))); *see also Gilbert v. Homar*, 520 U.S. 924, 928–29, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) ("[W]e have previously held that public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process."). Jurgens also asserts that he was only a few months away from vesting in the public employees' retirement system.

**51.** *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 280 n. 26 (Alaska 2003); *see also Paul v. Davis*, 424 U.S. 693, 701–02, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that reputation alone does not implicate any liberty or property interests sufficient to trigger procedural protections of Fourteenth Amendment).

**52.** We therefore reject Jurgens's argument that "North Pole does not have a governmental interest in dismissing every full-time employee accused of, and engaging in, arguable sexual harassment involving neither physical touching nor *quid pro quo* sexual harassment." (Emphasis in original.) We also reject Jurgens's argument that North Pole's interest is somehow lessened by the fact that it has a progressive disciplinary policy. *See* NPMC 2.36.310(B). And we reject Jurgens's argument that North Pole has a "countervailing interest" in retaining a valuable employee like Jurgens.

**53.** *Coleman*, 797 A.2d at 795 (quoting *Meyers v. Montgomery County Police Dep't*, 96 Md.App. 668, 626 A.2d 1010, 1028 (1993)).

**54.** *See In re Walton*, 676 P.2d 1078, 1090 (Alaska 1983) (Rabinowitz, J., dissenting) ("If [the accused] is indeed innocent of the allegations made against him, the risk of wrongful discipline would be significantly reduced by using the clear and convincing evidence standard.").

**55.** *Walton*, 676 P.2d at 1085 (holding that "[b]ecause there are substantial interest[s] on both sides, the risk of error should be borne equally. That is accomplished by use of the preponderance of the evidence standard.").

clude that North Pole's current procedural safeguards, including its use of the preponderance of the evidence standard, are adequate to protect officers from erroneous deprivation of their protected interests in their employment as well as their reputational and financial interests.[56] Because due process is satisfied by use of the preponderance of the evidence standard, Jurgens is not entitled to a heightened proof standard.[57]

### E. The Board Did Not Err by Finding Just Cause To Terminate Jurgens.

Jurgens argues that the board erred by failing to use the test outlined in the *Enterprise Wire Co.*[58] arbitration to determine whether just cause supported Jurgens's termination. *Enterprise Wire* announced a seven-part test for determining whether there is just cause to support a termination.[59] North Pole argues that Jurgens waived this argument by not presenting it to the board.

#### 1. Jurgens did not preserve this issue for appeal.

 Jurgens did not argue at the pre-termination hearing that the board should use the *Enterprise Wire* test to determine whether just cause supported his termination. In fact, Jurgens argued a *different* and more nuanced just-cause test in his closing statement to the board. Jurgens is incorrect in his assertion that he preserved the issue by presenting it to the superior court.

Jurgens waived the argument that the board needed to use the *Enterprise Wire* test by not presenting it at the administrative level.[60]

#### 2. North Pole had just cause to terminate Jurgens.

The North Pole Municipal Code states that officers may only be dismissed for just cause.[61] North Pole Municipal Code 2.36.310(A) provides that "[d]isciplinary action shall range from verbal admonishment, letter of reprimand, suspension from duty without pay, to *dismissal for just cause*, all to be administered according to accepted principles of proper management." (Emphasis added.) North Pole Municipal Code 2.36.321(F)(4) requires the pre-termination review board to determine whether there is just cause to dismiss the employee. The ordinance does not define "just cause." Jurgens argues that the ordinance must be read with standard statutory analysis principles in mind, and that the ordinance therefore requires that the department have "objective just cause" to terminate an officer.

 Absent statutory or contractual guidance to the contrary, we apply a just cause test that takes into account both the subjective and objective belief of the employer.[62] In *Braun v. Alaska Commercial Fishing & Agriculture Bank*, we adopted the Washington Supreme Court's approach for

---

**56.** *Coleman,* 797 A.2d at 795. The risk of error should already be low because the pre-termination hearing incorporated many procedural safeguards including notice, representation by counsel, the right to present evidence and testimony, and the right to cross-examine witnesses. *See* NPMC 2.36.321(F)(3); *see also In re Walton,* 676 P.2d at 1085 n. 9 (noting that risk of error in bar disciplinary proceedings should be low because "extensive procedural protections ... surround bar disciplinary proceedings").

**57.** Although it does not apply in this case, the Alaska Executive Branch Ethics Act, AS 39.52, is instructive. The act requires public officials in the executive branch to adhere to its ethical standards, AS 39.52.110, and allows the personnel board to recommend a variety of penalties, including dismissal, if it finds after conducting a hearing that a public official has violated the act. AS 39.52.370, .410. Under the act, the preponderance of the evidence standard applies at the hearing. AS 39.52.360(c).

**58.** *Enter. Wire Co.,* 46 Lab. Arb. Rep. (BNA) 356, 359–62 (1966) (Daugherty, Arb.).

**59.** *See Alaska State Employees Ass'n/AFSCME Local 52, AFL–CIO v. State,* 74 P.3d 881, 886 n. 19 (Alaska 2003) (quoting test from *Enterprise Wire*).

**60.** *See Bd. of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin.,* 968 P.2d 86, 93 (Alaska 1998) (holding that we consider issues not raised at administrative level waived); *see also Alaska State Employees Ass'n,* 74 P.3d at 886 (refusing to apply *Enterprise Wire* test on appeal because appellant failed to raise issue below).

**61.** NPMC 2.36.310(A), .321(F)(4).

**62.** *Cassel v. State, Dep't of Admin.,* 14 P.3d 278, 284 (Alaska 2000).

determining whether just cause supports a termination:

> [A] discharge for "just cause" is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true. [63]

Jurgens argues that *Braun* is not applicable here; the crux of his argument is that *Braun* should not be applied because it "emphasizes an employer's good faith subjective belief, not objective standards." [64]

Jurgens misreads *Braun*. As mentioned, the *Braun* approach is both subjective and objective. In *Cassel v. State, Department of Administration*, we explained that "[the *Braun* approach] checks the subjective good faith of the employer with an objective reasonable belief standard." [65] We will thus "uphold a good faith termination upon substantial evidence of an 'objective failure to meet acceptable standards.' " [66]

■ We agree with Jurgens that the North Pole ordinance requires an objective basis for terminating an officer,[67] but conclude that the *Braun* approach satisfies that requirement.[68] We therefore consider whether the board had "just cause" under *Braun* to affirm Jurgens's termination.

Jurgens argues that the board "overlooked Chief Hatman's bad faith investigation."

Jurgens argues that Chief Hatman "did not want to hear Jurgens' 'side of the story.' " But whether Chief Hatman investigated Jurgens's "side of the story" has little import here because Jurgens participated in a hearing before the board during which he could have told his "side of the story" by presenting testimony and evidence and cross-examining adverse witnesses.[69]

■ Jurgens also suggests that Chief Hatman's investigation was not conducted fairly and objectively because Chief Hatman "was simultaneously a 'prosecutor', a 'judge', and a witness against Jurgens." Jurgens's briefing regarding this issue is cursory: he mentions the issue in only one sentence and provides no supporting citation to any legal authority, much less any authority reversing a termination following a full hearing before an administrative hearing panel. We assume from his limited briefing that Jurgens is arguing that Chief Hatman's role as "prosecutor, judge, and witness" prohibits a finding of just cause termination under *Enterprise Wire*,[70] and was, more generally, a violation of due process. But Jurgens has not demonstrated any colorable basis for suspecting that Chief Hatman engaged in a biased investigation and termination process. Even if we were to assume that the board gave some deference to Chief Hatman's findings and decision to terminate Jurgens, Jurgens's opportunity to be heard, to present evidence

---

63. *Braun v. Alaska Commercial Fishing & Agric. Bank*, 816 P.2d 140, 142 (Alaska 1991) (quoting *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wash.2d 127, 769 P.2d 298, 304 (1989)); *see also Cassel*, 14 P.3d at 284 (applying *Braun* test); *Manning v. Alaska R.R. Corp.*, 853 P.2d 1120, 1125 (Alaska 1993) (applying *Braun* test).

64. Jurgens also argues that *Braun* does not apply here because *Braun* followed a Washington case involving private employment, and "Washington [courts] would probably not apply [that] just cause test to undefined 'just cause' terms under [a] municipal ordinance." We do not need to consider here how the Washington Supreme Court would apply its own jurisprudence because *Braun* prescribes an objective just cause standard—the standard Jurgens requests.

65. *Cassel*, 14 P.3d at 284 (quoting *Univ. of Alaska v. Tovsen*, 835 P.2d 445, 447 (Alaska 1992)).

66. *Id.* at 284 (quoting *Baldwin*, 769 P.2d at 304).

67. *See* NPMC 2.36.010(A) (stating that purpose of chapter is to "establish and operate a system of personnel administration based upon equitable merit principles and professional methods governing ... removal, [and] discipline ... of employees"), .310(A) (requiring system of "uniform and equitable administration of discipline"), .310(B) (requiring that "discipline [ ] be administered in increasingly progressive severity"), .321(F) (allowing board to impose "lesser disciplinary action"); *Tovsen*, 835 P.2d at 447 (holding that words "found," "evaluated," and "unsatisfactory" in personnel regulation required an objective just cause termination).

68. *See Braun*, 816 P.2d at 142.

69. *See* NPMC 2.36.321(F)(3).

70. *See Enter. Wire*, 46 Lab. Arb. Rep. at 362 ("Was the employer's investigation conducted fairly and objectively?").

and challenge adverse evidence at the hearing conducted by the three-person board, and to file an administrative appeal in the superior court, eliminates any due process concerns. Given the board hearing and the administrative appeal, we are unconvinced by Jurgens's cursory and unsupported argument that Chief Hatman's involvement undermined the impartiality of the board's decision.

■ In rendering its decision, the board recognized that it needed to make a just-cause determination and then stated: "[I]t is the unanimous opinion of the Review Board based on the testimony and evidence presented during the hearing, the City of North Pole Municipal Code, and considering also Sergeant Jurgens's role as a supervisor, that the sexual harassment constituted a serious offense justifying dismissal." Given the evidence presented at the hearing, the board's finding of just cause meets the *Braun* test. North Pole had legitimate reasons to dismiss Jurgens, including allegations of sexual harassment supported by substantial evidence at the hearing, much of which was uncontroverted.[71] And it was reasonable, after North Pole presented uncontroverted evidence of sexual harassment conduct and the effect of such conduct on employees in the department, for the board to believe the evidence against Jurgens, to consider the city's allegations proved, and to affirm Jurgens's dismissal.[72]

### F. The Board Did Not Err in Affirming Jurgens's Termination.

Consistent with NPMC 2.36.321(F)(4), the board considered whether to "affirm the dismissal, impose a lesser disciplinary action, or prohibit the imposition of discipline." The board concluded that Jurgens's conduct justi-

fied dismissal. Jurgens argues that "North Pole could legally dismiss Sgt. Jurgens for cause only if it also considered and concluded Sgt. Jurgens could not be rehabilitated" and only if such a conclusion were supported by substantial evidence. Jurgens argues that by failing to do so, the city breached the implied covenant of good faith and fair dealing.[73] Jurgens argues that the North Pole police operations manual forms part of Jurgens's employment contract and that read together, the municipal ordinance and the manual create a "system of discipline ... to rehabilitate employees" that includes " 'an opportunity to modify behavior,' once the employee has been 'place[d] ... on notice that conduct is unacceptable.' "[74] North Pole does not dispute that the police operations manual formed part of Jurgens's employment contract, or that the ordinance and manual require the city to consider rehabilitation and an opportunity to modify behavior. But North Pole argues that Jurgens's conduct was egregious and demanded immediate termination, and that Jurgens did not present any evidence indicating that he was a good candidate for rehabilitation.

Our review is limited to determining whether substantial evidence supports the board's decision that Jurgens could not be rehabilitated and that no lesser sanction was appropriate.[75]

■ The board's conclusion that Jurgens's sexual harassment conduct "constituted a serious offense justifying dismissal" was supported by substantial evidence. As we explained in Part III.C, North Pole presented substantial evidence to support a finding that Jurgens's conduct was serious, pervasive, and offensive. Although Jurgens presented some evidence that he was remorseful about his conduct, he qualified many of his

---

71. *See Braun*, 816 P.2d at 142.

72. *See id.*

73. *See Rutledge v. Alyeska Pipeline Serv. Co.*, 727 P.2d 1050, 1056 (Alaska 1986).

74. *See* NPMC 2.36.310(B) ("For all but major breaches of work rules, discipline should be administered in increasingly progressive severity; and be appropriate for the offense or incident. The city subscribes to the accepted management

principle that the purpose of a system of discipline is to rehabilitate employees."); North Pole Police Operations Manual ("The purpose of progressive discipline is to place a person on notice that conduct is unacceptable and to give the person an opportunity to modify behavior.").

75. Although the board did not explicitly reject a rehabilitation-oriented sanction, that decision is implicit in its conclusion.

remorseful statements. For example, in reference to the pacifier incident, Jurgens stated, "if I could take that back, I would take that back, but we were all laughing about it and having a good time." Jurgens also testified that he thought his dismissal was an unduly severe punishment because "it was never offensive. [Streeter] never told me it was offensive." And Jurgens testified that although he had at times acted inappropriately, "some of the things that were brought up, some of the things are—some people do have some axes to grind with me." Jurgens has also suggested that Streeter incited or solicited Jurgens's conduct. And he has suggested that Streeter made the complaint against him in retaliation for concerns he raised about her.

Chief Hatman testified that dismissal was the only appropriate sanction:

> Looking at the action that was taken and the environment that was created, I didn't feel that I had any remedy other than termination.... I can't transfer him, I can't demote him, I can't do anything else with him that would remove that environment that was created. There was nothing else I could do to remedy the environment that had been created, other than removing him from it, period.

Jurgens tries to draw a distinction between the conduct that the board found he engaged in and "major" sexual harassment (i.e., quid pro quo sexual harassment or conduct of a physical nature). He also contrasts his behavior with criminal behavior for which dismissal is an automatic sanction.[76] But the ordinance itself does not make these distinctions. The board's chosen sanction was within the range of available sanctions for sexual harassment. North Pole Municipal Code 2.36.291(C) provides: "Sexual harassment is a form of misconduct which constitutes a serious offense and subjects offenders to disciplinary action, *up to and including discharge.*" (Emphasis added.) Given the uncontradicted evidence of sexual harassment behavior, Chief Hatman's testimony that no lesser sanction was available, and Jurgens's testimony that suggests he did not take full responsibility for his conduct, substantial evidence supported the board's decision to affirm Jurgens's dismissal and reject lesser rehabilitation-oriented sanctions.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's decision that affirmed the board's decision.

**76.** *See* NPMC 2.36.270(D), .300(B).